# FLAST ET AL. *v.* COHEN, SECRETARY OF HEALTH, EDUCATION, AND WELFARE, ET AL.

No. 416.   Argued March 12, 1968.—Decided June 10, 1968.

84

*Leo Pfeffer* argued the cause for appellants. With him on the briefs were *David I. Ashe, Ernest Fleischman,* and *Alan H. Levine.*

*Solicitor General Griswold* argued the cause for appellees. With him on the brief were *Assistant Attorney General Weisl, Alan S. Rosenthal,* and *Robert V. Zener.*

*Sam J. Ervin, Jr.,* argued the cause and filed a brief for Americans for Public Schools et al., as *amici curiae,* urging reversal.

Briefs of *amici curiae,* urging reversal, were filed by *Melvin J. Sykes* and *Sanford Jay Rosen* for the Council of Chief State School Officers et al.; by *Henry C. Clausen* for United Americans for Public Schools; by *Norman Dorsen* and *Charles H. Tuttle* for the National Council of Churches; by *Franklin C. Salisbury* for Protestants and Other Americans United for Separation of Church and State, and by *Arnold Forster, Edwin J. Lukas, Joseph B. Robison, Paul Hartman,* and *Sol Rabkin* for the American Jewish Committee et al.

Briefs of *amici curiae,* urging affirmance, were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations; by *Julius Berman* and *Reuben E. Gross* for the National Jewish Commission on Law and Public Affairs, and by *Herbert Brownell, Thomas F. Daly,* and *William E. McCurdy, Jr.,* for Spira et al.

Mr. Chief Justice Warren delivered the opinion of the Court.

In *Frothingham* v. *Mellon,* 262 U. S. 447 (1923), this Court ruled that a federal taxpayer is without standing to challenge the constitutionality of a federal statute. That ruling has stood for 45 years as an impenetrable barrier to suits against Acts of Congress brought by individuals who can assert only the interest of federal taxpayers. In this case, we must decide whether the *Frothingham* barrier should be lowered when a taxpayer attacks a federal statute on the ground that it violates the Establishment and Free Exercise Clauses of the First Amendment.

Appellants filed suit in the United States District Court for the Southern District of New York to enjoin the allegedly unconstitutional expenditure of federal funds under Titles I and II of the Elementary and Secondary Education Act of 1965, 79 Stat. 27, 20 U. S. C. §§ 241a *et seq.,* 821 *et seq.* (1964 ed., Supp. II). The complaint alleged that the seven appellants had as a common attribute that "each pay[s] income taxes of the United States," and it is clear from the complaint that the appellants were resting their standing to maintain the action solely on their status as federal taxpayers.[1] The appellees, who are charged by Congress with administering the Elementary and Secondary Education Act of 1965, were sued in their official capacities.

The gravamen of the appellants' complaint was that federal funds appropriated under the Act were being used to finance instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks

---

[1] The complaint alleged that one of the appellants "has children regularly registered in and attending the elementary or secondary grades in the public schools of New York." However, the District Court did not view that additional allegation as being relevant to the question of standing, and appellants have made no effort to justify their standing on that additional ground.

and other instructional materials for use in such schools. Such expenditures were alleged to be in contravention of the Establishment and Free Exercise Clauses of the First Amendment. Appellants' constitutional attack focused on the statutory criteria which state and local authorities must meet to be eligible for federal grants under the Act. Title I of the Act establishes a program for financial assistance to local educational agencies for the education of low-income families. Federal payments are made to state educational agencies, which pass the payments on in the form of grants to local educational agencies. Under § 205 of the Act, 20 U. S. C. § 241e, a local educational agency wishing to have a plan or program funded by a grant must submit the plan or program to the appropriate state educational agency for approval. The plan or program must be "consistent with such basic criteria as the [appellee United States Commissioner of Education] may establish." The specific criterion of that section attacked by the appellants is the requirement

> "that, to the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency has made provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate . . . ." 20 U. S. C. § 241e (a)(2).

Under § 206 of the Act, 20 U. S. C. § 241f, the Commissioner of Education is given broad powers to supervise a State's participation in Title I programs and grants. Title II of the Act establishes a program of federal grants for the acquisition of school library resources, textbooks,

and other printed and published instructional materials "for the use of children and teachers in public and private elementary and secondary schools." 20 U. S. C. § 821. A State wishing to participate in the program must submit a plan to the Commissioner for approval, and the plan must

> "provide assurance that to the extent consistent with law such library resources, textbooks, and other instructional materials will be provided on an equitable basis for the use of children and teachers in private elementary and secondary schools in the State . . . ." 20 U. S. C. § 823 (a)(3)(B).

While disclaiming any intent to challenge as unconstitutional all programs under Title I of the Act, the complaint alleges that federal funds have been disbursed under the Act, "with the consent and approval of the [appellees]," and that such funds have been used and will continue to be used to finance "instruction in reading, arithmetic and other subjects and for guidance in religious and sectarian schools" and "the purchase of textbooks and instructional and library materials for use in religious and sectarian schools." Such expenditures of federal tax funds, appellants alleged, violate the First Amendment because "they constitute a law respecting an establishment of religion" and because "they prohibit the free exercise of religion on the part of the [appellants] . . . by reason of the fact that they constitute compulsory taxation for religious purposes." The complaint asked for a declaration that appellees' actions in approving the expenditure of federal funds for the alleged purposes were not authorized by the Act or, in the alternative, that if appellees' actions are deemed within the authority and intent of the Act, "the Act is to that extent unconstitutional and void." The complaint also prayed for an injunction to enjoin appel-

lees from approving any expenditure of federal funds for the allegedly unconstitutional purposes. The complaint further requested that a three-judge court be convened as provided in 28 U. S. C. §§ 2282, 2284.

The Government moved to dismiss the complaint on the ground that appellants lacked standing to maintain the action. District Judge Frankel, who considered the motion, recognized that *Frothingham* v. *Mellon, supra,* provided "powerful" support for the Government's position, but he ruled that the standing question was of sufficient substance to warrant the convening of a three-judge court to decide the question. 267 F. Supp. 351 (1967). The three-judge court received briefs and heard arguments limited to the standing question, and the court ruled on the authority of *Frothingham* that appellants lacked standing. Judge Frankel dissented. 271 F. Supp. 1 (1967). From the dismissal of their complaint on that ground, appellants appealed directly to this Court, 28 U. S. C. § 1253, and we noted probable jurisdiction. 389 U. S. 895 (1967). For reasons explained at length below, we hold that appellants do have standing as federal taxpayers to maintain this action, and the judgment below must be reversed.

## I.

We must deal first with the Government's contention that this Court lacks jurisdiction on direct appeal because a three-judge court was improperly convened below.[2]  Under 28 U. S. C. § 1253, direct appeal to this

---

[2] This issue was not raised in the court below, and the Government argued it for the first time in its brief in this Court. The Government claims the inappropriateness of convening a three-judge court became apparent only as the issues in the case have been clarified by appellants. Because the question now presented goes to our jurisdiction on direct appeal, the lateness of the claim is irrelevant to our consideration of it. *United States* v. *Griffin,* 303 U. S. 226, 229 (1938).

Court from a district court lies only "from an order granting or denying . . . an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges." Thus, if the Government is correct, we lack jurisdiction over this direct appeal.

The Government's argument on this question is two-pronged. First, noting that appellants have conceded that the case should be deemed one limited to the practices of the New York City Board of Education, the Government contends that appellants wish only to forbid specific local programs which they find objectionable and not to enjoin the operation of the broad range of programs under the statutory scheme. Only if the latter relief is sought, the Government argues, can a three-judge court properly be convened under 28 U. S. C. § 2282. We cannot accept the Government's argument in the context of this case. It is true that the appellants' complaint makes specific reference to the New York City Board of Education's programs which are funded under the challenged statute, and we can assume that appellants' proof at trial would focus on those New York City programs. However, we view these allegations of the complaint as imparting specificity and focus to the issues in the lawsuit and not as limiting the impact of the constitutional challenge made in this case. The injunctive relief sought by appellants is not limited to programs in operation in New York City but extends to *any* program that would have the unconstitutional features alleged in the complaint. Congress enacted § 2282 "to prevent a single federal judge from being able to paralyze totally the operation of an entire regulatory scheme . . . by issuance of a broad injunctive order." *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 154 (1963). If the District Court in this case were to rule for appellants on the merits of their constitutional attack on New York

City's federally funded programs, that decision would cast sufficient doubt on similar programs elsewhere as to cause confusion approaching paralysis to surround the challenged statute. Therefore, even if the injunction which might issue in this case were narrower than that sought by appellants, we are satisfied that the legislative policy underlying § 2282 was served by the convening of a three-judge court, despite appellants' focus on New York City's programs.

Secondly, the Government argues that a three-judge court should not have been convened because appellants question not the constitutionality of the Elementary and Secondary Education Act of 1965 but its administration.[3] The decision in *Zemel* v. *Rusk*, 381 U. S. 1 (1965), is dispositive on this issue. It is true that appellants' complaint states a nonconstitutional ground for relief, namely, that appellees' actions in approving the expenditure of federal funds for allegedly unconstitutional programs are in excess of their authority under the Act. However, the complaint also requests an alternative and constitutional ground for relief, namely, a declaration that, if appellees' actions "are within the authority and intent of the Act, the Act is to that extent unconstitutional and void." The Court noted in *Zemel* v. *Rusk, supra,* "[W]e have often held that a litigant need not abandon his nonconstitutional arguments in order to ob-

---

[3] The Government also seems to argue that, if any administrative action is suspect, it is the action of state officials and not of appellees. For example, the Government describes federal participation in the challenged programs as "remote." Brief for Appellees 17. The premise for this argument is apparently that, under 20 U. S. C. § 241e, programs of local educational agencies require only the direct approval of state officials to be eligible for grants. However, appellees are given broad powers of supervision over state participation by 20 U. S. C. § 241f, and it is federal funds administered by appellees that finance the local programs. We cannot characterize such federal participation as "remote."

tain a three-judge court." 381 U. S., at 5–6. See also *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73 (1960); *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535 (1954). The complaint in this case falls within that rule.

Thus, since the three-judge court was properly convened below,[4] direct appeal to this Court is proper. We turn now to the standing question presented by this case.

## II.

This Court first faced squarely[5] the question whether a litigant asserting only his status as a taxpayer has standing to maintain a suit in a federal court in *Frothingham* v. *Mellon, supra,* and that decision must be the starting point for analysis in this case. The taxpayer in *Frothingham* attacked as unconstitutional the Maternity Act of 1921, 42 Stat. 224, which established a federal program of grants to those States which would undertake programs to reduce maternal and infant mortality. The taxpayer alleged that Congress, in enacting the challenged statute, had exceeded the powers delegated to it under Article I of the Constitution and had invaded the legislative province reserved to the several States by the Tenth Amendment. The taxpayer complained that the result of the allegedly unconstitutional enactment would be to increase her future federal tax

---

[4] An additional requirement for the convening of a three-judge court is that the constitutional question presented be substantial. See *Idlewild Bon Voyage Liquor Corp.* v. *Epstein,* 370 U. S. 713 (1962); *Ex parte Poresky,* 290 U. S. 30 (1933). The Government does not dispute the substantiality of the constitutional attack made by appellants on the Elementary and Secondary Education Act of 1965. See *Flast* v. *Gardner,* 267 F. Supp. 351, 352 (1967).

[5] In at least three cases prior to *Frothingham,* the Court accepted jurisdiction in taxpayer suits without passing directly on the standing question. *Wilson* v. *Shaw,* 204 U. S. 24, 31 (1907); *Millard* v. *Roberts,* 202 U. S. 429, 438 (1906); *Bradfield* v. *Roberts,* 175 U. S. 291, 295 (1899).

liability and "thereby take her property without due process of law." 262 U. S., at 486. The Court noted that a federal taxpayer's "interest in the moneys of the Treasury . . . is comparatively minute and indeterminable" and that "the effect upon future taxation, of any payment out of the [Treasury's] funds, . . . [is] remote, fluctuating and uncertain." *Id.*, at 487. As a result, the Court ruled that the taxpayer had failed to allege the type of "direct injury" necessary to confer standing. *Id.*, at 488.

Although the barrier *Frothingham* erected against federal taxpayer suits has never been breached, the decision has been the source of some confusion and the object of considerable criticism. The confusion has developed as commentators have tried to determine whether *Frothingham* establishes a constitutional bar to taxpayer suits or whether the Court was simply imposing a rule of self-restraint which was not constitutionally compelled.[6] The conflicting viewpoints are reflected in the arguments made to this Court by the parties in this case. The Government has pressed upon us the view that *Frothingham* announced a constitutional rule, compelled by the Article III limitations on federal court jurisdiction and grounded in considerations of the doctrine of separation of powers. Appellants, however, insist that

---

[6] The prevailing view of the commentators is that *Frothingham* announced only a nonconstitutional rule of self-restraint. See, *e. g.*, Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv. L. Rev. 255, 302–303 (1961); Arthur Garfield Hays Civil Liberties Conference: Public Aid to Parochial Schools and Standing to Bring Suit, 12 Buffalo L. Rev. 35, 48–65 (1962); Davis, Standing to Challenge Governmental Action, 39 Minn. L. Rev. 353, 386–391 (1955). But see Hearings on S. 2097 before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, 89th Cong., 2d Sess., 465, 467–468 (1966) (statement of Prof. William D. Valente). The last-cited hearings contain the best collection of recent expression of views on this question.

*Frothingham* expressed no more than a policy of judicial self-restraint which can be disregarded when compelling reasons for assuming jurisdiction over a taxpayer's suit exist. The opinion delivered in *Frothingham* can be read to support either position.[7] The concluding sentence of the opinion states that, to take jurisdiction of the taxpayer's suit, "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." 262 U. S., at 489. Yet the concrete reasons given for denying standing to a federal taxpayer suggest that the Court's holding rests on something less than a constitutional foundation. For example, the Court conceded that standing had previously been conferred on municipal taxpayers to sue in that capacity. However, the Court viewed the interest of a federal taxpayer in total federal tax revenues as "comparatively minute and indeterminable" when measured against a municipal taxpayer's interest in a smaller city treasury. *Id.,* at 486–487. This suggests that the petitioner in *Frothingham* was denied standing not because she was a taxpayer but because her tax bill was not large enough. In addition, the Court spoke of the "attendant inconveniences" of entertaining that taxpayer's suit because it might open the door of federal courts to countless such suits "in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned." *Id.,* at 487. Such a statement suggests pure policy considerations.

---

[7] "Although the Court in the latter part of the opinion used language suggesting that it did not find the elements of a justiciable controversy present in the case, the case in its central aspect turns on application of the judicially formulated [*i. e.,* nonconstitutional] rules respecting standing." Hearings on S. 2097, *supra,* n. 6, at 503 (statement of Prof. Paul G. Kauper).

To the extent that *Frothingham* has been viewed as resting on policy considerations, it has been criticized as depending on assumptions not consistent with modern conditions. For example, some commentators have pointed out that a number of corporate taxpayers today have a federal tax liability running into hundreds of millions of dollars, and such taxpayers have a far greater monetary stake in the Federal Treasury than they do in any municipal treasury.[8] To some degree, the fear expressed in *Frothingham* that allowing one taxpayer to sue would inundate the federal courts with countless similar suits has been mitigated by the ready availability of the devices of class actions and joinder under the Federal Rules of Civil Procedure, adopted subsequent to the decision in *Frothingham*.[9] Whatever the merits of the current debate over *Frothingham*, its very existence suggests that we should undertake a fresh examination of the limitations upon standing to sue in a federal court and the application of those limitations to taxpayer suits.

## III.

The jurisdiction of federal courts is defined and limited by Article III of the Constitution. In terms relevant to the question for decision in this case, the judicial power of federal courts is constitutionally restricted to "cases" and "controversies." As is so often the situation in constitutional adjudication, those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the

---

[8] See, *e. g.*, Hearings on S. 2097, supra, n. 6, at 493 (statement of Prof. Kenneth C. Davis); Note, 69 Yale L. J. 895, 917, and n. 127 (1960).

[9] Judge Frankel's dissent below also noted that federal courts have learned in recent years to cope effectively with "huge litigations" and "redundant actions." 271 F. Supp., at 17.

words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

Justiciability is itself a concept of uncertain meaning and scope. Its reach is illustrated by the various grounds upon which questions sought to be adjudicated in federal courts have been held not to be justiciable. Thus, no justiciable controversy is presented when the parties seek adjudication of only a political question,[10] when the parties are asking for an advisory opinion,[11] when the question sought to be adjudicated has been mooted by subsequent developments,[12] and when there is no standing to maintain the action.[13] Yet it remains true that "[j]usticiability is . . . not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures . . . ." *Poe* v. *Ullman*, 367 U. S. 497, 508 (1961).

Part of the difficulty in giving precise meaning and form to the concept of justiciability stems from the un-

---

[10] See, *e. g., Commercial Trust Co.* v. *Miller,* 262 U. S. 51 (1923); *Luther* v. *Borden,* 7 How. 1 (1849).

[11] See, *e. g., United States* v. *Fruehauf,* 365 U. S. 146 (1961); *Muskrat* v. *United States,* 219 U. S. 346 (1911).

[12] See, *e. g., California* v. *San Pablo & T. R. Co.,* 149 U. S. 308 (1893).

[13] See, *e. g., Tileston* v. *Ullman,* 318 U. S. 44 (1943); *Frothingham* v. *Mellon,* 262 U. S. 447 (1923).

certain historical antecedents of the case-and-controversy doctrine. For example, Mr. Justice Frankfurter twice suggested that historical meaning could be imparted to the concepts of justiciability and case and controversy by reference to the practices of the courts of Westminster when the Constitution was adopted. *Joint Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123, 150 (1951) (concurring opinion); *Coleman* v. *Miller*, 307 U. S. 433, 460 (1939) (separate opinion). However, the power of English judges to deliver advisory opinions was well established at the time the Constitution was drafted. 3 K. Davis, Administrative Law Treatise 127–128 (1958). And it is quite clear that "the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." C. Wright, Federal Courts 34 (1963).[14] Thus, the implicit policies embodied in Article III, and not history alone, impose the rule against advisory opinions on federal courts. When the federal judicial power is invoked to pass upon the validity of actions by the Legislative and Executive Branches of the Government, the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III. See *Muskrat* v. *United States*, 219 U. S. 346 (1911); 3 H. Johnston, Correspondence and Public Papers of John Jay 486–489 (1891) (correspondence between Secretary of State Jefferson and Chief Justice Jay). However, the rule against advisory opinions also recognizes that such suits often "are not pressed before the Court with that clear concreteness provided when a question emerges precisely

---

[14] The rule against advisory opinions was established as early as 1793, see 3 H. Johnston, Correspondence and Public Papers of John Jay 486–489 (1891), and the rule has been adhered to without deviation. See *United States* v. *Fruehauf*, 365 U. S. 146, 157 (1961), and cases cited therein.

framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests." *United States* v. *Fruehauf,* 365 U. S. 146, 157 (1961). Consequently, the Article III prohibition against advisory opinions reflects the complementary constitutional considerations expressed by the justiciability doctrine: Federal judicial power is limited to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.

Additional uncertainty exists in the doctrine of justiciability because that doctrine has become a blend of constitutional requirements and policy considerations. And a policy limitation is "not always clearly distinguished from the constitutional limitation." *Barrows* v. *Jackson,* 346 U. S. 249, 255 (1953). For example, in his concurring opinion in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 345–348 (1936), Mr. Justice Brandeis listed seven rules developed by this Court "for its own governance" to avoid passing prematurely on constitutional questions. Because the rules operate in "cases confessedly within [the Court's] jurisdiction," *id.,* at 346, they find their source in policy, rather than purely constitutional, considerations. However, several of the cases cited by Mr. Justice Brandeis in illustrating the rules of self-governance articulated purely constitutional grounds for decision. See, *e. g., Massachusetts* v. *Mellon,* 262 U. S. 447 (1923); *Fairchild* v. *Hughes,* 258 U. S. 126 (1922); *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339 (1892). The "many subtle pressures" [15] which cause policy considerations to blend into the constitutional limitations of Article III make the justiciability doctrine one of uncertain and shifting contours.

---

[15] *Poe* v. *Ullman,* 367 U. S. 497, 508 (1961).

It is in this context that the standing question presented by this case must be viewed and that the Government's argument on that question must be evaluated. As we understand it, the Government's position is that the constitutional scheme of separation of powers, and the deference owed by the federal judiciary to the other two branches of government within that scheme, present an absolute bar to taxpayer suits challenging the validity of federal spending programs. The Government views such suits as involving no more than the mere disagreement by the taxpayer "with the uses to which tax money is put." [16] According to the Government, the resolution of such disagreements is committed to other branches of the Federal Government and not to the judiciary. Consequently, the Government contends that, under no circumstances, should standing be conferred on federal taxpayers to challenge a federal taxing or spending program.[17] An analysis of the function served by standing limitations compels a rejection of the Government's position.

Standing is an aspect of justiciability and, as such, the problem of standing is surrounded by the same complexities and vagaries that inhere in justiciability.

---

[16] Brief for Appellees 7.

[17] The logic of the Government's argument would compel it to concede that a taxpayer would lack standing even if Congress engaged in such palpably unconstitutional conduct as providing funds for the construction of churches for particular sects. See *Flast* v. *Gardner,* 271 F. Supp. 1, 5 (1967) (dissenting opinion of Frankel, J.). The Government professes not to be bothered by such a result because it contends there might be individuals in society other than taxpayers who could invoke federal judicial power to challenge such unconstitutional appropriations. However, if as we conclude there are circumstances under which a taxpayer will be a proper and appropriate party to seek judicial review of federal statutes, the taxpayer's access to federal courts should not be barred because there might be at large in society a hypothetical plaintiff who might possibly bring such a suit.

Standing has been called one of "the most amorphous [concepts] in the entire domain of public law." [18] Some of the complexities peculiar to standing problems result because standing "serves, on occasion, as a shorthand expression for all the various elements of justiciability." [19] In addition, there are at work in the standing doctrine the many subtle pressures which tend to cause policy considerations to blend into constitutional limitations.[20]

Despite the complexities and uncertainties, some meaningful form can be given to the jurisdictional limitations placed on federal court power by the concept of standing. The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is

---

[18] Hearings on S. 2097, *supra*, n. 6, at 498 (statement of Prof. Paul A. Freund).

[19] Lewis, Constitutional Rights and the Misuse of "Standing," 14 Stan. L. Rev. 433, 453 (1962).

[20] Thus, a general standing limitation imposed by federal courts is that a litigant will ordinarily not be permitted to assert the rights of absent third parties. See, *e. g., Heald* v. *District of Columbia,* 259 U. S. 114, 123 (1922); *Yazoo & Miss. Valley R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217 (1912). However, this rule has not been imposed uniformly as a firm constitutional restriction on federal court jurisdiction. See, *e. g., Dombrowski* v. *Pfister,* 380 U. S. 479, 486–487 (1965); *Barrows* v. *Jackson,* 346 U. S. 249 (1953).

challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable.[21] Thus, a party may have standing in a particular case, but the federal court may nevertheless decline to pass on the merits of the case because, for example, it presents a political question.[22] A proper party is demanded so that federal courts will not be asked to decide "ill-defined controversies over constitutional issues," *United Public Workers* v. *Mitchell,* 330 U. S. 75, 90 (1947), or a case which is of "a hypothetical or abstract character," *Aetna Life Insurance Co.* v. *Haworth,* 300 U. S. 227, 240 (1937). So stated, the standing requirement is closely related to, although more general than, the rule that federal courts will not entertain friendly suits, *Chicago & Grand Trunk R. Co.* v. *Wellman, supra,* or those which are feigned or collusive in nature, *United States* v. *Johnson,* 319 U. S. 302 (1943); *Lord* v. *Veazie,* 8 How. 251 (1850).

When the emphasis in the standing problem is placed on whether the person invoking a federal court's jurisdiction is a proper party to maintain the action, the weakness of the Government's argument in this case becomes apparent. The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such prob-

---

[21] This distinction has not always appeared with clarity in prior cases. See Bickel, Foreword: The Passive Virtues, The Supreme Court, 1960 Term, 75 Harv. L. Rev. 40, 75–76 (1961).

[22] One contemporary commentator advanced such an explanation for the holding in *Frothingham,* suggesting that the standing rationale was simply a device used by the Court to avoid judicial inquiry into questions of social policy and the political wisdom of Congress. See Finkelstein, Judicial Self-Limitation, 37 Harv. L. Rev. 338, 359–364 (1924).

lems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. It is for that reason that the emphasis in standing problems is on whether the party invoking federal court jurisdiction has "a personal stake in the outcome of the controversy," *Baker* v. *Carr, supra,* at 204, and whether the dispute touches upon "the legal relations of parties having adverse legal interests." *Aetna Life Insurance Co.* v. *Haworth, supra,* at 240–241. A taxpayer may or may not have the requisite personal stake in the outcome, depending upon the circumstances of the particular case. Therefore, we find no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs. There remains, however, the problem of determining the circumstances under which a federal taxpayer will be deemed to have the personal stake and interest that impart the necessary concrete adverseness to such litigation so that standing can be conferred on the taxpayer *qua* taxpayer consistent with the constitutional limitations of Article III.

## IV.

The various rules of standing applied by federal courts have not been developed in the abstract. Rather, they have been fashioned with specific reference to the status asserted by the party whose standing is challenged and to the type of question he wishes to have adjudicated. We have noted that, in deciding the question of standing, it is not relevant that the substantive issues in the litigation might be nonjusticiable. However, our decisions

establish that, in ruling on standing, it is both appropriate and necessary to look to the substantive issues for another purpose, namely, to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated. For example, standing requirements will vary in First Amendment religion cases depending upon whether the party raises an Establishment Clause claim or a claim under the Free Exercise Clause. See *McGowan* v. *Maryland,* 366 U. S. 420, 429–430 (1961). Such inquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power. Thus, our point of reference in this case is the standing of individuals who assert only the status of federal taxpayers and who challenge the constitutionality of a federal spending program. Whether such individuals have standing to maintain that form of action turns on whether they can demonstrate the necessary stake as taxpayers in the outcome of the litigation to satisfy Article III requirements.

The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in *Doremus* v. *Board of Education,* 342 U. S. 429 (1952). Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds

specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.

The taxpayer-appellants in this case have satisfied both nexuses to support their claim of standing under the test we announce today. Their constitutional challenge is made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare, and the challenged program involves a substantial expenditure of federal tax funds.[23] In addition, appellants have alleged that the challenged expenditures violate the Establishment and Free Exercise Clauses of the First Amendment. Our history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general. James Madison, who is generally recognized as the leading architect of the religion clauses of the First Amendment, observed in his famous Memorial and Remonstrance Against Religious Assessments that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever." 2 Writings of James Madison 183, 186 (Hunt ed. 1901). The concern of Madison and his supporters was quite clearly that religious liberty ultimately would be the victim if

---

[23] Almost $1,000,000,000 was appropriated to implement the Elementary and Secondary Education Act in 1965. 79 Stat. 832.

government could employ its taxing and spending powers to aid one religion over another or to aid religion in general.[24] The Establishment Clause was designed as a specific bulwark against such potential abuses of governmental power, and that clause of the First Amendment [25] operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8.

The allegations of the taxpayer in *Frothingham* v. *Mellon, supra,* were quite different from those made in this case, and the result in *Frothingham* is consistent with the test of taxpayer standing announced today. The taxpayer in *Frothingham* attacked a federal spending program and she, therefore, established the first nexus

---

[24] The Memorial and Remonstrance was Madison's impassioned reaction to a bill introduced in the Virginia General Assembly in 1785 to provide a tax levy to support teachers of the Christian religion. Madison's eloquent opposition to the levy generated strong support in Virginia, and the Assembly postponed consideration of the proposal until its next session. When the bill was revived, it died in committee and the Assembly instead enacted the famous Virginia Bill for Religious Liberty authored by Thomas Jefferson. The Virginia experience is recounted in S. Cobb, Rise of Religious Liberty in America 490–499 (1902).

[25] Appellants have also alleged that the Elementary and Secondary Education Act of 1965 violates the Free Exercise Clause of the First Amendment. This Court has recognized that the taxing power can be used to infringe the free exercise of religion. *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943). Since we hold that appellants' Establishment Clause claim is sufficient to establish the nexus between their status and the precise nature of the constitutional infringement alleged, we need not decide whether the Free Exercise claim, standing alone, would be adequate to confer standing in this case. We do note, however, that the challenged tax in *Murdock* operated upon a particular class of taxpayers. When such exercises of the taxing power are challenged, the proper party emphasis in the federal standing doctrine would require that standing be limited to the taxpayers within the affected class.

required.  However, she lacked standing because her
constitutional attack was not based on an allegation that
Congress, in enacting the Maternity Act of 1921, had
breached a specific limitation upon its taxing and spend-
ing power.  The taxpayer in *Frothingham* alleged es-
sentially that Congress, by enacting the challenged
statute, had exceeded the general powers delegated to it
by Art. I, § 8, and that Congress had thereby invaded
the legislative province reserved to the States by the
Tenth Amendment.  To be sure, Mrs. Frothingham
made the additional allegation that her tax liability
would be increased as a result of the allegedly uncon-
stitutional enactment, and she framed that allegation in
terms of a deprivation of property without due process
of law.  However, the Due Process Clause of the Fifth
Amendment does not protect taxpayers against increases
in tax liability, and the taxpayer in *Frothingham* failed
to make any additional claim that the harm she alleged
resulted from a breach by Congress of the specific con-
stitutional limitations imposed upon an exercise of the
taxing and spending power.  In essence, Mrs. Frothing-
ham was attempting to assert the States' interest in
their legislative prerogatives and not a federal taxpayer's
interest in being free of taxing and spending in contra-
vention of specific constitutional limitations imposed
upon Congress' taxing and spending power.

We have noted that the Establishment Clause of the
First Amendment does specifically limit the taxing and
spending power conferred by Art. I, § 8.  Whether the
Constitution contains other specific limitations can be
determined only in the context of future cases.  How-
ever, whenever such specific limitations are found, we
believe a taxpayer will have a clear stake as a taxpayer
in assuring that they are not breached by Congress.
Consequently, we hold that a taxpayer will have stand-

ing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. Such an injury is appropriate for judicial redress, and the taxpayer has established the necessary nexus between his status and the nature of the allegedly unconstitutional action to support his claim of standing to secure judicial review. Under such circumstances, we feel confident that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution. We lack that confidence in cases such as *Frothingham* where a taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System.

While we express no view at all on the merits of appellants' claims in this case,[26] their complaint contains sufficient allegations under the criteria we have outlined to give them standing to invoke a federal court's jurisdiction for an adjudication on the merits.

*Reversed.*

---

[26] In fact, it is impossible to make any such judgment in the present posture of this case. The proceedings in the court below thus far have been devoted solely to the threshold question of standing, and nothing in the record bears upon the merits of the substantive questions presented in the complaint.

Mr. Justice Douglas, concurring.

While I have joined the opinion of the Court, I do not think that the test it lays down is a durable one for the reasons stated by my Brother Harlan. I think, therefore, that it will suffer erosion and in time result in the demise of *Frothingham* v. *Mellon,* 262 U. S. 447. It would therefore be the part of wisdom, as I see the problem, to be rid of *Frothingham* here and now.

I do not view with alarm, as does my Brother Harlan, the consequences of that course. *Frothingham,* decided in 1923, was in the heyday of substantive due process, when courts were sitting in judgment on the wisdom or reasonableness of legislation. The claim in *Frothingham* was that a federal regulatory Act dealing with maternity deprived the plaintiff of property without due process of law. When the Court used substantive due process to determine the wisdom or reasonableness of legislation, it was indeed transforming itself into the Council of Revision which was rejected by the Constitutional Convention. It was that judicial attitude, not the theory of standing to sue rejected in *Frothingham,* that involved "important hazards for the continued effectiveness of the federal judiciary," to borrow a phrase from my Brother Harlan. A contrary result in *Frothingham* in that setting might well have accentuated an ominous trend to judicial supremacy.

But we no longer undertake to exercise that kind of power. Today's problem is in a different setting.

Most laws passed by Congress do not contain even a ghost of a constitutional question. The "political" decisions, as distinguished from the "justiciable" ones, occupy most of the spectrum of congressional action. The case or controversy requirement comes into play only when the Federal Government does something that affects a person's life, his liberty, or his property. The wrong may be slight or it may be grievous. Madison in denouncing

state support of churches said the principle was violated when even "three pence" was appropriated to that cause by the Government.[1]  It therefore does not do to talk about taxpayers' interest as "infinitesimal."  The restraint on "liberty" may be fleeting and passing and still violate a fundamental constitutional guarantee.  The "three pence" mentioned by Madison may signal a monstrous invasion by the Government into church affairs, and so on.

The States have experimented with taxpayers' suits and with only two exceptions [2] now allow them.  A few state decisions are frankly based on the theory that a taxpayer is a private attorney general seeking to vindicate the public interest.[3]  Some of them require that the taxpayer have more than an infinitesimal financial stake in the problem.[4]  At the federal level, Congress can of

---

[1] Memorial and Remonstrance against Religious Assessments, 2 Writings of James Madison 186 (Hunt ed. 1901).

[2] The two clear exceptions are municipal taxpayers' suits in Kansas (see *Asendorf* v. *Common School Dist. No. 102*, 175 Kan. 601, 266 P. 2d 309 (1954)) and state taxpayers' suits in New York (see *Schieffelin* v. *Komfort*, 212 N. Y. 520, 106 N. E. 675 (1914); *St. Clair* v. *Yonkers Raceway*, 13 N. Y. 2d 72, 242 N. Y. S. 2d 43, 192 N. E. 2d 15 (1963); but see *Kuhn* v. *Curran*, 294 N. Y. 207, 61 N. E. 2d 513 (1945)).

[3] See, *e. g.*, *Clapp* v. *Town of Jaffrey*, 97 N. H. 456, 91 A. 2d 464 (1952); *Vibberts* v. *Hart*, 85 R. I. 35, 125 A. 2d 193 (1956); *Lien* v. *Northwestern Engineering Co.*, 74 S. D. 476, 54 N. W. 2d 472 (1952).  ("It is now the settled law of this state that a taxpayer or elector having no special interest may institute an action to protect a public right." 74 S. D., at 479, 54 N. W. 2d, at 474.)

[4] See, *e. g.*, *Crews* v. *Beattie*, 197 S. C. 32, 14 S. E. 2d 351 (1941); *Goodland* v. *Zimmerman*, 243 Wis. 459, 10 N. W. 2d 180 (1943) (taxpayer may not enjoin state expenditure of $1.49); contra, *Richardson* v. *Blackburn*, 41 Del. Ch. 54, 187 A. 2d 823 (1963); *Woodard* v. *Reily*, 244 La. 337, 152 So. 2d 41 (1963).

The estimates of commentators as to how many jurisdictions have specifically upheld taxpayers' suits range from 32 to 40.  See

course define broad categories of "aggrieved" persons who have standing to litigate cases or controversies. But, contrary to what my Brother HARLAN suggests, the failure of Congress to act has not barred this Court from allowing standing to sue and from providing remedies. The multitude of cases under the Fourth, as well as the Fourteenth Amendment, are witness enough.[5]

The constitutional guide is "cases" or "controversies" within the meaning of § 2 of Art. III of the Constitution. As respects our appellate jurisdiction, Congress may largely fashion it as Congress desires by reason of the express provisions of § 2, Art. III. See *Ex parte Mc-Cardle,* 7 Wall. 506. But where there is judicial power to act, there is judicial power to deal with all the facets of the old issue of standing.

Taxpayers can be vigilant private attorneys general. Their stake in the outcome of litigation may be *de minimis* by financial standards, yet very great when measured by a particular constitutional mandate. My Brother HARLAN's opinion reflects the British, not the American, tradition of constitutionalism. We have a written Constitution; and it is full of "thou shalt nots" directed at Congress and the President as well as at the courts.

---

generally 3 K. Davis, Administrative Law Treatise § 22.09 (1958), §§ 22.09–22.10 (1965 Supp.); Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265, 1276–1281 (1961); Comment, Taxpayers' Suits: A Survey and Summary, 69 Yale L. J. 895 (1960); *St. Clair* v. *Yonkers Raceway,* 13 N. Y. 2d 72, 77–81, 242 N. Y. S. 2d 43, 45–49, 192 N. E. 2d 15, 16–19 (1963) (dissenting opinion of Fuld, J.).

[5] See, *e. g., NAACP* v. *Alabama,* 357 U. S. 449; *Pierce* v. *Society of Sisters,* 268 U. S. 510. As the Court said in *Barrows* v. *Jackson,* 346 U. S. 249, 255, apart from Article III jurisdictional questions, standing involves a "rule of self-restraint for its own governance" which "this Court has developed" itself. And attempts by Congress to confer standing when it is constitutionally lacking are unavailing. *Muskrat* v. *United States,* 219 U. S. 346.

And the role of the federal courts is not only to serve as referee between the States and the center but also to protect the individual against prohibited conduct by the other two branches of the Federal Government.

There has long been a school of thought here that the less the judiciary does, the better. It is often said that judicial intrusion should be infrequent, since it is "always attended with a serious evil, namely, that the correction of legislative mistakes comes from the outside, and the people thus lose the political experience, and the moral education and stimulus that come from fighting the question out in the ordinary way, and correcting their own errors"; that the effect of a participation by the judiciary in these processes is "to dwarf the political capacity of the people, and to deaden its sense of moral responsibility." J. Thayer, John Marshall 106, 107 (1901).

The late Edmond Cahn, who opposed that view, stated my philosophy. He emphasized the importance of the role that the federal judiciary was designed to play in guarding basic rights against majoritarian control. He chided the view expressed by my Brother HARLAN: "we are entitled to reproach the majoritarian justices of the Supreme Court . . . with straining to be reasonable when they ought to be adamant." Can the Supreme Court Defend Civil Liberties? in Samuel, ed., Toward a Better America 132, 144 (1968). His description of our constitutional tradition was in these words:

> "Be not reasonable with inquisitions, anonymous informers, and secret files that mock American justice. Be not reasonable with punitive denationalizations, ex post facto deportations, labels of disloyalty, and all the other stratagems for outlawing human beings from the community of mankind. These devices have put us to shame. Exercise the full judicial power of the United States; nullify

them, forbid them; and make us proud again." *Id.,* 144–145.

The judiciary is an indispensable part of the operation of our federal system. With the growing complexities of government it is often the one and only place where effective relief can be obtained. If the judiciary were to become a super-legislative group sitting in judgment on the affairs of people, the situation would be intolerable. But where wrongs to individuals are done by violation of specific guarantees, it is abdication for courts to close their doors.

Marshall wrote in *Marbury* v. *Madison,* 1 Cranch 137, 178, that if the judiciary stayed its hand in deference to the legislature, it would give the legislature "a practical and real omnipotence." My Brother HARLAN's view would do just that, for unless Congress created a procedure through which its legislative creation could be challenged quickly and with ease, the momentum of what it had done would grind the dissenter under.

We have a Constitution designed to keep government out of private domains. But the fences have often been broken down; and *Frothingham* denied effective machinery to restore them. The Constitution even with the judicial gloss it has acquired plainly is not adequate to protect the individual against the growing bureaucracy in the Legislative and Executive Branches. He faces a formidable opponent in government, even when he is endowed with funds and with courage. The individual is almost certain to be plowed under, unless he has a well-organized active political group to speak for him. The church is one. The press is another. The union is a third. But if a powerful sponsor is lacking, individual liberty withers—in spite of glowing opinions and resounding constitutional phrases.

I would not be niggardly therefore in giving private attorneys general standing to sue. I would certainly not

wait for Congress to give its blessing to our deciding cases clearly within our Article III jurisdiction. To wait for a sign from Congress is to allow important constitutional questions to go undecided and personal liberty unprotected.

There need be no inundation of the federal courts if taxpayers' suits are allowed. There is a wise judicial discretion that usually can distinguish between the frivolous question and the substantial question, between cases ripe for decision and cases that need prior administrative processing, and the like.[6] When the judiciary is no longer "a great rock"[7] in the storm, as Lord Sankey once put it, when the courts are niggardly in the use of their power and reach great issues only timidly and reluctantly, the force of the Constitution in the life of the Nation is greatly weakened.

Gideon Hausner, after reviewing the severe security measures sometimes needed for Israel's survival and the vigilance of her courts in maintaining the rights of individuals, recently stated, "When all is said and done, one is inclined to think that a rigid constitutional frame is on the whole preferable even if it serves no better purpose than obstructing and embarrassing an over-active Executive." Individuals' Rights in the Courts of Israel, International Lawyers Convention In Israel, 1958, pp. 201, 228 (1959).

That observation is apt here, whatever the transgression and whatever branch of government may be implicated. We have recently reviewed the host of devices

---

[6] "The general indifference of private individuals to public omissions and encroachments, the fear of expense in unsuccessful and even in successful litigation, and the discretion of the court, have been, and doubtless will continue to be, a sufficient guard to these public officials against too numerous and unreasonable attacks." *Ferry* v. *Williams*, 41 N. J. L. 332, 339 (Sup. Ct. 1879).

[7] Quoted in the Law Times, March 17, 1928, at 242.

used by the States to avoid opening to Negroes public facilities enjoyed by whites. *Green* v. *School Board of New Kent County,* 391 U. S. 430; *Raney* v. *Board of Education,* 391 U. S. 443; *Monroe* v. *Board of Commissioners,* 391 U. S. 450. There is a like process at work at the federal level in respect to aid to religion. The efforts made to insert in the law an express provision which would allow federal aid to sectarian schools to be reviewable in the courts was defeated.[8] The mounting federal aid to sectarian schools is notorious and the subterfuges numerous.[9]

---

[8] These efforts, commencing in 1961, are discussed in S. Rep. No. 85, 90th Cong., 1st Sess., 2–3 (1967), and S. Rep. No. 473, 90th Cong., 1st Sess., 10–15 (1967). The Senate added such a provision to the Higher Education Facilities Act of 1963, but it did not survive conference. S. Rep. No. 85, at 2. A bill, S. 3, to make certain "establishment" questions reviewable has been reported by the Senate in the Ninetieth Congress.

[9] "Tuition grants to parents of students in church schools is considered by the clerics and their helpers to have possibilities. The idea here is that the parent receives the money, carries it down to the school, and gives it to the priest. Since the money pauses a moment with the parent before going to the priest, it is argued that this evades the constitutional prohibition against government money for religion! This is a diaphanous trick which seeks to do indirectly what may not be done directly.

"Another one is the 'authority.' The state may not grant aid directly to church schools. But how about setting up an authority— like the Turnpike Authority? The state could give the money to the authority which, under one pretext or another, could channel it into the church schools.

"Yet another favorite of those who covet sectarian subsidies is 'child benefit.' Government may not aid church schools, but it may aid the children in the schools. The trouble with this argument is that it proves too much. Anything that is done for a school would presumably be of some benefit to the children in it. Government could even build church school classrooms, under this theory, because it would benefit the children to have nice rooms to study in." 21 Church & State (June 1968), p. 5 (editorial).

I would be as liberal in allowing taxpayers standing to object to these violations of the First Amendment as I would in granting standing to people to complain of any invasion of their rights under the Fourth Amendment or the Fourteenth or under any other guarantee in the Constitution itself or in the Bill of Rights.

MR. JUSTICE STEWART, concurring.

I join the judgment and opinion of the Court, which I understand to hold only that a federal taxpayer has standing to assert that a specific expenditure of federal funds violates the Establishment Clause of the First Amendment. Because that clause plainly prohibits taxing and spending in aid of religion, every taxpayer can claim a personal constitutional right not to be taxed for the support of a religious institution. The present case is thus readily distinguishable from *Frothingham* v. *Mellon,* 262 U. S. 447, where the taxpayer did not rely on an explicit constitutional prohibition but instead questioned the scope of the powers delegated to the national legislature by Article I of the Constitution.

As the Court notes, "one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general." *Ante,* at 103. Today's decision no more than recognizes that the appellants have a clear stake as taxpayers in assuring that they not be compelled to contribute even "three pence . . . of [their] property for the support of any one establishment." *Ibid.* In concluding that the appellants therefore have standing to sue, we do not undermine the salutary principle, established by *Frothingham* and reaffirmed today, that a taxpayer may not "employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System." *Ante,* at 106.

Mr. Justice Fortas, concurring.

I would confine the ruling in this case to the proposition that a taxpayer may maintain a suit to challenge the validity of a federal expenditure on the ground that the expenditure violates the Establishment Clause. As the Court's opinion recites, there is enough in the constitutional history of the Establishment Clause to support the thesis that this Clause includes a *specific* prohibition upon the use of the power to tax to support an establishment of religion.* There is no reason to suggest, and no basis in the logic of this decision for implying, that there may be other types of congressional expenditures which may be attacked by a litigant solely on the basis of his status as a taxpayer.

I agree that *Frothingham* does not foreclose today's result. I agree that the congressional powers to tax and spend are limited by the prohibition upon Congress to enact laws "respecting an establishment of religion." This thesis, slender as its basis is, provides a direct "nexus," as the Court puts it, between the use and collection of taxes and the congressional action here. Because of this unique "nexus," in my judgment, it is not far-fetched to recognize that a taxpayer has a special claim to status as a litigant in a case raising the "establishment" issue. This special claim is enough, I think, to permit us to allow the suit, coupled, as it is, with the interest which the taxpayer and all other citizens have in the church-state issue. In terms of the structure and basic philosophy of our constitutional government, it would be difficult to point to any issue that has a more intimate, pervasive, and fundamental impact upon the life of the taxpayer—and upon the life of all citizens.

Perhaps the vital interest of a citizen in the establishment issue, without reference to his taxpayer's status,

---

*See *ante,* at 104, n. 24.

would be acceptable as a basis for this challenge. We need not decide this. But certainly, I believe, we must recognize that our principle of judicial scrutiny of legislative acts which raise important constitutional questions requires that the issue here presented—the separation of state and church—which the Founding Fathers regarded as fundamental to our constitutional system—should be subjected to judicial testing. This is not a question which we, if we are to be faithful to our trust, should consign to limbo, unacknowledged, unresolved, and undecided.

On the other hand, the urgent necessities of this case and the precarious opening through which we find our way to confront it, do not demand that we open the door to a general assault upon exercises of the spending power. The status of taxpayer should not be accepted as a launching pad for an attack upon any target other than legislation affecting the Establishment Clause. See concurring opinion of STEWART, J., *ante,* p. 114.

MR. JUSTICE HARLAN, dissenting.

The problems presented by this case are narrow and relatively abstract, but the principles by which they must be resolved involve nothing less than the proper functioning of the federal courts, and so run to the roots of our constitutional system. The nub of my view is that the end result of *Frothingham* v. *Mellon,* 262 U. S. 447, was correct, even though, like others,[1] I do not subscribe to all of its reasoning and premises. Although I therefore agree with certain of the conclusions reached today by the Court,[2] I cannot accept the standing doctrine

---

[1] See, *e. g.,* Davis, Standing to Challenge Governmental Action, 39 Minn. L. Rev. 353; L. Jaffe, Judicial Control of Administrative Action 483–495 (1965).

[2] In particular, I agree, essentially for the reasons stated by the Court, that we do not lack jurisdiction under 28 U. S. C. § 1253 to consider the judgment of the three-judge District Court.

that it substitutes for *Frothingham,* for it seems to me that this new doctrine rests on premises that do not withstand analysis. Accordingly, I respectfully dissent.

## I.

It is desirable first to restate the basic issues in this case. The question here is not, as it was not in *Frothingham,* whether "a federal taxpayer is without standing to challenge the constitutionality of a federal statute." *Ante,* at 85. It could hardly be disputed that federal taxpayers may, as taxpayers, contest the constitutionality of tax obligations imposed severally upon them by federal statute. Such a challenge may be made by way of defense to an action by the United States to recover the amount of a challenged tax debt, see, *e. g., Hylton* v. *United States,* 3 Dall. 171; *McCray* v. *United States,* 195 U. S. 27; *United States* v. *Butler,* 297 U. S. 1; or to a prosecution for willful failure to pay or to report the tax. See, *e. g., Marchetti* v. *United States,* 390 U. S. 39. Moreover, such a challenge may provide the basis of an action by a taxpayer to obtain the refund of a previous tax payment. See, *e. g., Bailey* v. *Drexel Furniture Co.,* 259 U. S. 20.

The lawsuits here and in *Frothingham* are fundamentally different. They present the question whether federal taxpayers *qua* taxpayers may, in suits in which they do not contest the validity of their previous or existing tax obligations, challenge the constitutionality of the uses for which Congress has authorized the expenditure of public funds. These differences in the purposes of the cases are reflected in differences in the litigants' interests. An action brought to contest the validity of tax liabilities assessed to the plaintiff is designed to vindicate interests that are personal and proprietary. The wrongs alleged and the relief sought by such a plaintiff are unmistakably private; only secondarily are his interests representative of those of the general population. I take

it that the Court, although it does not pause to examine the question, believes that the interests of those who as taxpayers challenge the constitutionality of public expenditures may, at least in certain circumstances, be similar. Yet this assumption is surely mistaken.[3]

The complaint in this case, unlike that in *Frothingham,* contains no allegation that the contested expenditures will in any fashion affect the amount of these taxpayers' own existing or foreseeable tax obligations. Even in cases in which such an allegation is made, the suit cannot result in an adjudication either of the plaintiff's tax liabilities or of the propriety of any particular level of taxation. The relief available to such a plaintiff consists entirely of the vindication of rights held in common by all citizens. It is thus scarcely surprising that few of the state courts that permit such suits require proof either that the challenged expenditure is consequential in amount or that it is likely to affect significantly the plaintiff's own tax bill; these courts have at least impliedly recognized that such allegations are surplusage, useful only to preserve the form of an obvious fiction.[4]

Nor are taxpayers' interests in the expenditure of public funds differentiated from those of the general public by any special rights retained by them in their tax payments. The simple fact is that no such rights can sensibly be said to exist. Taxes are ordinarily levied by the United States without limitations of purpose; absent such a limitation, payments received by the Treasury in satisfaction of tax obligations lawfully created become part of the Government's general funds. The national legislature is required by the Constitution to

---

[3] I put aside, for the moment, the suggestion that a taxpayer's rights under the Establishment Clause are more "personal" than they are under any other constitutional provision.

[4] See generally Comment, Taxpayers' Suits: A Survey and Summary, 69 Yale L. J. 895, 905–906.

exercise its spending powers to "provide for the common Defence and general Welfare." Art. I, § 8, cl. 1. Whatever other implications there may be to that sweeping phrase, it surely means that the United States holds its general funds, not as stakeholder or trustee for those who have paid its imposts, but as surrogate for the population at large. Any rights of a taxpayer with respect to the purposes for which those funds are expended are thus subsumed in, and extinguished by, the common rights of all citizens. To characterize taxpayers' interests in such expenditures as proprietary or even personal either deprives those terms of all meaning or postulates for taxpayers a *scintilla juris* in funds that no longer are theirs.

Surely it is plain that the rights and interests of taxpayers who contest the constitutionality of public expenditures are markedly different from those of "Hohfeldian" plaintiffs,[5] including those taxpayer-plaintiffs who challenge the validity of their own tax liabilities. We must recognize that these non-Hohfeldian plaintiffs complain, just as the petitioner in *Frothingham* sought to complain, not as taxpayers, but as "private attorneys-general."[6] The interests they represent, and the rights they espouse, are bereft of any personal or proprietary coloration. They are, as litigants, indistinguishable from any group selected at random from among the general

---

[5] The phrase is Professor Jaffe's, adopted, of course, from W. Hohfeld, Fundamental Legal Conceptions (1923). I have here employed the phrases "Hohfeldian" and "non-Hohfeldian" plaintiffs to mark the distinction between the personal and proprietary interests of the traditional plaintiff, and the representative and public interests of the plaintiff in a public action. I am aware that we are confronted here by a spectrum of interests of varying intensities, but the distinction is sufficiently accurate, and convenient, to warrant its use at least for purposes of discussion.

[6] Cf. *Associated Industries* v. *Ickes*, 134 F. 2d 694, 704; *Reade* v. *Ewing*, 205 F. 2d 630, 632.

population, taxpayers and nontaxpayers alike. These are and must be, to adopt Professor Jaffe's useful phrase, "public actions" brought to vindicate public rights.[7]

It does not, however, follow that suits brought by non-Hohfeldian plaintiffs are excluded by the "case or controversy" clause of Article III of the Constitution from the jurisdiction of the federal courts. This and other federal courts have repeatedly held that individual litigants, acting as private attorneys-general, may have standing as "representatives of the public interest." *Scripps-Howard Radio* v. *Comm'n*, 316 U. S. 4, 14. See also *Commission* v. *Sanders Radio Station*, 309 U. S. 470, 477; *Associated Industries* v. *Ickes*, 134 F. 2d 694; *Reade* v. *Ewing*, 205 F. 2d 630; *Scenic Hudson Preservation Conf.* v. *FPC*, 354 F. 2d 608; *Office of Communication of United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 359 F. 2d 994. Compare *Oklahoma* v. *Civil Service Comm'n*, 330 U. S. 127, 137–139. And see, on actions *qui tam, Marvin* v. *Trout*, 199 U. S. 212, 225; *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 546. The various lines of authority are by no means free of difficulty, and certain of the cases may be explicable as involving a personal, if remote, economic interest, but I think that it is, nonetheless, clear that non-Hohfeldian plaintiffs as such are not *constitutionally* excluded from the federal courts. The problem ultimately presented by this case is, in my view, therefore to determine in what circumstances, consonant with the character and proper functioning of the federal courts, such suits should be permitted.[8] With this preface, I shall examine the position adopted by the Court.

---

[7] L. Jaffe, Judicial Control of Administrative Action 483 (1965).

[8] I agree that implicit in this question is the belief that the federal courts may decline to accept for adjudication cases or questions that, although otherwise within the perimeter of their constitutional jurisdiction, are appropriately thought to be unsuitable at

## II.

As I understand it, the Court's position is that it is unnecessary to decide in what circumstances public actions should be permitted, for it is possible to identify situations in which taxpayers who contest the constitutionality of federal expenditures assert "personal" rights and interests, identical in principle to those asserted by Hohfeldian plaintiffs. This position, if supportable, would of course avoid many of the difficulties of this case; indeed, if the Court is correct, its extended exploration of the subtleties of Article III is entirely unnecessary. But, for reasons that follow, I believe that the Court's position is untenable.

The Court's analysis consists principally of the observation that the requirements of standing are met if a taxpayer has the "requisite personal stake in the outcome" of his suit. *Ante,* at 101. This does not, of course, resolve the standing problem; it merely restates it. The Court implements this standard with the declaration that taxpayers will be "deemed" to have the necessary personal interest if their suits satisfy two criteria: *first,* the challenged expenditure must form part of a federal spending program, and not merely be "incidental" to a regulatory program; and *second,* the constitutional provision under which the plaintiff claims must be a "specific limitation" upon Congress' spending powers. The difficulties with these criteria are many and severe, but it is enough for the moment to emphasize that they are not in any sense a measurement of any plaintiff's interest in the outcome of any suit. As even a cursory examination of

---

least for immediate judicial resolution. Compare *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 345–348 (concurring opinion); H. Wechsler, Principles, Politics, and Fundamental Law 9–15 (1961); and Bickel, Foreword: The Passive Virtues, The Supreme Court, 1960 Term, 75 Harv. L. Rev. 40, 45–47 (1961).

the criteria will show, the Court's standard for the determination of standing and its criteria for the satisfaction of that standard are entirely unrelated.

It is surely clear that a plaintiff's interest in the outcome of a suit in which he challenges the constitutionality of a federal expenditure is not made greater or smaller by the unconnected fact that the expenditure is, or is not, "incidental" to an "essentially regulatory" program.[9] An example will illustrate the point. Assume that two independent federal programs are authorized by Congress, that the first is designed to encourage a specified religious group by the provision to it of direct grants-in-aid, and that the second is designed to discourage all other religious groups by the imposition of various forms of discriminatory regulation. Equal amounts are appropriated by Congress for the two programs. If a taxpayer challenges their constitutionality in separate suits,[10] are we to suppose, as evidently does the Court, that his

---

[9] I must note at the outset that I cannot determine with any certainty the Court's intentions with regard to this first criterion. Its use of *Doremus* v. *Board of Education*, 342 U. S. 429, as an analogue perhaps suggests that it intends to exclude only those cases in which there are virtually no public expenditures. See, *e. g.*, *Howard* v. *City of Boulder*, 132 Colo. 401, 290 P. 2d 237. On the other hand, the Court also emphasizes that the contested programs may not be "essentially regulatory" programs, and that the statute challenged here "involves a *substantial* expenditure of federal tax funds." *Ante*, at 102, 103 (emphasis added). Presumably this means that the Court's standing doctrine also excludes any program in which the expenditures are "insubstantial" or which cannot be characterized as a "spending" program.

[10] I am aware that the attack upon the second program would presumably be premised, at least in large part, upon the Free Exercise Clause, and that the Court does not today hold that that clause is within its standing doctrine. I cannot, however, see any meaningful distinction for these purposes, even under the Court's reasoning, between the two religious clauses.

"personal stake" in the suit involving the second is necessarily smaller than it is in the suit involving the first, and that he should therefore have standing in one but not the other?

Presumably the Court does not believe that regulatory programs are necessarily less destructive of First Amendment rights, or that regulatory programs are necessarily less prodigal of public funds than are grants-in-aid, for both these general propositions are demonstrably false. The Court's disregard of regulatory expenditures is not even a logical consequence of its apparent assumption that taxpayer-plaintiffs assert essentially monetary interests, for it surely cannot matter to a taxpayer *qua* taxpayer whether an unconstitutional expenditure is used to hire the services of regulatory personnel or is distributed among private and local governmental agencies as grants-in-aid. His interest as taxpayer arises, if at all, from the fact of an unlawful expenditure, and not as a consequence of the expenditure's form. Apparently the Court has repudiated the emphasis in *Frothingham* upon the amount of the plaintiff's tax bill, only to substitute an equally irrelevant emphasis upon the form of the challenged expenditure.

The Court's second criterion is similarly unrelated to its standard for the determination of standing. The intensity of a plaintiff's interest in a suit is not measured, even obliquely, by the fact that the constitutional provision under which he claims is, or is not, a "specific limitation" upon Congress' spending powers. Thus, among the claims in *Frothingham* was the assertion that the Maternity Act, 42 Stat. 224, deprived the petitioner of property without due process of law. The Court has evidently concluded that this claim did not confer standing because the Due Process Clause of the Fifth Amendment is not a specific limitation upon the spending

powers.[11] Disregarding for the moment the formidable obscurity of the Court's categories, how can it be said that Mrs. Frothingham's interests in her suit were, as a consequence of her choice of a constitutional claim, necessarily less intense than those, for example, of the present appellants? I am quite unable to understand how, if a taxpayer believes that a given public expenditure is unconstitutional, and if he seeks to vindicate that belief in a federal court, his interest in the suit can be said necessarily to vary according to the constitutional provision under which he states his claim.

The absence of any connection between the Court's standard for the determination of standing and its criteria for the satisfaction of that standard is not merely a logical ellipsis. Instead, it follows quite relentlessly from the fact that, despite the Court's apparent belief, the plaintiffs in this and similar suits are non-Hohfeldian, and it is very nearly impossible to measure sensibly any differences in the intensity of their personal interests in their suits. The Court has thus been compelled simply to postulate situations in which such taxpayer-plaintiffs will be "deemed" to have the requisite "personal stake and interest." *Ante*, at 101. The logical inadequacies of the Court's criteria are thus a reflection of the deficiencies of its entire position. These deficiencies will, however, appear more plainly from an examination of the Court's treatment of the Establishment Clause.

---

[11] It should be emphasized that the Court finds it unnecessary to examine the history of the Due Process Clause to determine whether it was intended as a "specific limitation" upon Congress' spending and taxing powers. Nor does the Court pause to examine the purposes of the Tenth Amendment, another of the premises of the constitutional claims in *Frothingham*. But see *Gibbons* v. *Ogden*, 9 Wheat. 1, 199; *Veazie Bank* v. *Fenno*, 8 Wall. 533, 541; *United States* v. *Butler*, 297 U. S. 1. And compare *Everson* v. *Board of Education*, 330 U. S. 1, 6.

Although the Court does not altogether explain its position, the essence of its reasoning is evidently that a taxpayer's claim under the Establishment Clause is "not merely one of ultra vires," but one which instead asserts "an abridgment of individual religious liberty" and a "governmental infringement of individual rights protected by the Constitution." Choper, The Establishment Clause and Aid to Parochial Schools, 56 Calif. L. Rev. 260, 276. It must first be emphasized that this is apparently not founded upon any "preferred" position for the First Amendment, or upon any asserted unavailability of other plaintiffs.[12] The Court's position is instead that, because of the Establishment Clause's historical purposes, taxpayers retain rights under it quite different from those held by them under other constitutional provisions.

The difficulties with this position are several. First, we have recently been reminded that the historical purposes of the religious clauses of the First Amendment are significantly more obscure and complex than this Court has heretofore acknowledged.[13] Careful students

---

[12] The Court does make one reference to the availability *vel non* of other plaintiffs. It indicates that where a federal statute is directed at a specified class, "the proper party emphasis in the federal standing doctrine would require that standing be limited to the taxpayers within the affected class." *Ante,* at 104, n. 25. Assuming *arguendo* the existence of such a federal "best-plaintiff" rule, it is difficult to see why this rule would not altogether exclude taxpayers as plaintiffs under the Establishment Clause, since there plainly may be litigants under the Clause with the personal rights and interests of Hohfeldian plaintiffs. See, *e. g., Board of Education* v. *Allen,* decided today, *post,* p. 236.

[13] See, in particular, M. Howe, The Garden and the Wilderness 1–31 (1965); C. Antieau, A. Downey & E. Roberts, Freedom from Federal Establishment (1964). Not all members of the Court have of course ignored the complexities of the clause's history. See especially *McCollum* v. *Board of Education,* 333 U. S. 203, 238 (dissenting opinion of Reed, J.).

of the history of the Establishment Clause have found that "it is impossible to give a dogmatic interpretation of the First Amendment, and to state with any accuracy the intention of the men who framed it . . . ." [14] Above all, the evidence seems clear that the First Amendment was not intended simply to enact the terms of Madison's Memorial and Remonstrance against Religious Assessments.[15] I do not suggest that history is without relevance to these questions, or that the use of federal funds for religious purposes was not a form of establishment that many in the 18th century would have found objectionable. I say simply that, given the ultimate obscurity of the Establishment Clause's historical purposes, it is inappropriate for this Court to draw fundamental distinctions among the several constitutional commands upon the supposed authority of isolated dicta extracted from the clause's complex history. In particular, I have not found, and the opinion of the Court has not adduced, historical evidence that properly permits the Court to distinguish, as it has here, among the Establishment Clause, the Tenth Amendment, and the Due Process Clause of the Fifth Amendment as limitations upon Congress' taxing and spending powers.[16]

---

[14] Antieau, Downey & Roberts, *supra,* at 142. See also Howe, *supra,* at 10–12.

[15] See, in particular, Antieau, Downey & Roberts, *supra,* at 126–128, 144–146, 207–208. And see 1 Annals of Cong. 730–731. It has elsewhere been observed, I think properly, that "to treat [Madison's Remonstrance] as authoritatively incorporated in the First Amendment is to take grotesque liberties with the simple legislative process, and even more with the complex and diffuse process of ratification of an Amendment by three-fourths of the states." Brown, Quis Custodiet Ipsos Custodes?—The School-Prayer Cases, 1963 Sup. Ct. Rev. 1, 8.

[16] I will of course grant that claims under, for example, the Tenth Amendment may present "generalized grievances about the conduct of government or the allocation of power in the Federal System." *Ante,* at 106. I will also grant that it would be well if

The Court's position is equally precarious if it is assumed that its premise is that the Establishment Clause is in some uncertain fashion a more "specific" limitation upon Congress' powers than are the various other constitutional commands. It is obvious, first, that only in some Pickwickian sense are any of the provisions with which the Court is concerned "specific[ally]" limitations upon spending, for they contain nothing that is expressly directed at the expenditure of public funds. The specificity to which the Court repeatedly refers must therefore arise, not from the provisions' language, but from something implicit in their purposes. But this Court has often emphasized that Congress' powers to spend are coterminous with the purposes for which, and methods by which, it may act, and that the various constitutional commands applicable to the central government, including those implicit both in the Tenth Amendment and in the General Welfare Clause, thus operate as limitations upon spending. See *United States* v. *Butler,* 297 U. S. 1. And see, *e. g., Veazie Bank* v. *Fenno,* 8 Wall. 533, 541; *Loan Association* v. *Topeka,* 20 Wall. 655, 664; *Thompson* v. *Consolidated Gas Co.,* 300 U. S. 55, 80; *Carmichael* v. *Southern Coal Co.,* 301 U. S. 495; *Everson* v. *Board of Education,* 330 U. S. 1, 6. Compare *Steward Machine Co.* v. *Davis,* 301 U. S. 548; *Helvering* v. *Davis,* 301 U. S. 619. I can attach no constitutional significance to the various degrees of specificity with which these limitations appear in the terms or history of the Constitution. If the Court accepts the proposition, as I do,

such questions could be avoided by the federal courts. Unfortunately, I cannot see how these considerations are relevant under the Court's principal criterion, which I understand to be merely whether any given constitutional provision is, or is not, a limitation upon Congress' spending powers. It is difficult to see what there is in the fact that a constitutional provision is held to be such a limitation that could sensibly give the Court "confidence" about the fashion in which a given plaintiff will present a given issue.

that the number and scope of public actions should be restricted, there are, as I shall show, methods more appropriate, and more nearly permanent, than the creation of an amorphous category of constitutional provisions that the Court has deemed, without adequate foundation, "specific limitations" upon Congress' spending powers.

Even if it is assumed that such distinctions may properly be drawn, it does not follow that federal taxpayers hold any "personal constitutional right" such that they may each contest the validity under the Establishment Clause of all federal expenditures. The difficulty, with which the Court never comes to grips, is that taxpayers' suits under the Establishment Clause are not in these circumstances meaningfully different from other public actions. If this case involved a tax specifically designed for the support of religion, as was the Virginia tax opposed by Madison in his Memorial and Remonstrance,[17] I would agree that taxpayers have rights under the religious clauses of the First Amendment that would permit them standing to challenge the tax's validity in the federal courts. But this is not such a case, and appellants challenge an expenditure, not a tax. Where no such tax is involved, a taxpayer's complaint can consist only of an allegation that public funds have been, or shortly will be, expended for purposes inconsistent with the Constitution. The taxpayer cannot ask the return of any portion of his previous tax payments, cannot prevent the collection of any existing tax debt, and cannot demand an adjudication of the propriety of any particular level of taxation. His tax payments are received for the general purposes of the United States, and are, upon proper receipt, lost in the general revenues. Compare *Steward Machine Co.* v. *Davis, supra,* at 585. The interests he

---

[17] The bill was intended to establish "a provision for teachers of the Christian religion." It and the Memorial and Remonstrance are reprinted in *Everson* v. *Board of Education, supra,* at 63–74.

represents, and the rights he espouses, are, as they are in all public actions, those held in common by all citizens. To describe those rights and interests as personal, and to intimate that they are in some unspecified fashion to be differentiated from those of the general public, reduces constitutional standing to a word game played by secret rules.[18]

[18] I have equal difficulty with the argument that the religious clauses of the First Amendment create a "personal constitutional right," held by all *citizens*, such that any *citizen* may, under those clauses, contest the constitutionality of federal expenditures. The essence of the argument would presumably be that freedom from establishment is a right that inheres in every citizen, thus any citizen should be permitted to challenge any measure that conceivably involves establishment. Certain provisions of the Constitution, so the argument would run, create the basic structure of our society and of its government, and accordingly should be enforceable at the demand of every individual. Unlike the position taken today by the Court, such a doctrine of standing would at least be internally consistent, but it would also threaten the proper functioning both of the federal courts and of the principle of separation of powers. The Establishment Clause is, after all, only one of many provisions of the Constitution that might be characterized in this fashion. Certain of these provisions, *e. g.*, the Ninth and Tenth Amendments, would provide the basis for cases that, absent a standing question, could not readily be excluded from the federal courts as involving political questions, or as otherwise unsuitable for adjudication under the principles formulated for these purposes by the Court. Compare *United Public Workers* v. *Mitchell*, 330 U. S. 75, 94–96; *Griswold* v. *Connecticut*, 381 U. S. 479. Indeed, it might even be urged that the Ninth and Tenth Amendments, since they are largely confirmatory of rights created elsewhere in the Constitution, were intended to declare the standing of individual citizens to contest the validity of governmental activities. It may, of course, also be argued that these amendments are merely "tub[s] for the whale," 1 W. Crosskey, Politics and the Constitution 688 (1953); but lacking such an argument, any doctrine of standing premised upon the generality or relative importance of a constitutional command would, I think, very substantially increase the number of situa-

Apparently the Court, having successfully circumnavigated the issue, has merely returned to the proposition from which it began. A litigant, it seems, will have standing if he is "deemed" to have the requisite interest, and "if you . . . have standing, then you can be confident you are" suitably interested. Brown, Quis Custodiet Ipsos Custodes?—The School-Prayer Cases, 1963 Sup. Ct. Rev. 1, 22.

## III.

It seems to me clear that public actions, whatever the constitutional provisions on which they are premised, may involve important hazards for the continued effectiveness of the federal judiciary. Although I believe such actions to be within the jurisdiction conferred upon the federal courts by Article III of the Constitution, there surely can be little doubt that they strain the judicial function and press to the limit judicial authority. There is every reason to fear that unrestricted public actions might well alter the allocation of authority among the three branches of the Federal Government. It is not, I submit, enough to say that the present members of the Court would not seize these opportunities for abuse, for such actions would, even without conscious abuse, go far toward the final transformation of this Court into the Council of Revision which, despite Madison's support, was rejected by the Constitutional Convention.[19] I do not doubt that there must be "some effectual power in the government to restrain or correct the infractions"[20] of

tions in which individual citizens could present for adjudication "generalized grievances about the conduct of government." I take it that the Court, apart from my Brother Douglas, and I are agreed that any such consequence would be exceedingly undesirable.

[19] See 1 M. Farrand, The Records of the Federal Convention of 1787, at 21, 97–98, 108–110, 138–140 (1911); 2 Farrand, id., at 73–80.

[20] The Federalist No. 80 (Hamilton).

the Constitution's several commands, but neither can I suppose that such power resides only in the federal courts. We must as judges recall that, as Mr. Justice Holmes wisely observed, the other branches of the Government "are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, Kansas & Texas R. Co.* v. *May,* 194 U. S. 267, 270. The powers of the federal judiciary will be adequate for the great burdens placed upon them only if they are employed prudently, with recognition of the strengths as well as the hazards that go with our kind of representative government.

Presumably the Court recognizes at least certain of these hazards, else it would not have troubled to impose limitations upon the situations in which, and purposes for which, such suits may be brought. Nonetheless, the limitations adopted by the Court are, as I have endeavored to indicate, wholly untenable. This is the more unfortunate because there is available a resolution of this problem that entirely satisfies the demands of the principle of separation of powers. This Court has previously held that individual litigants have standing to represent the public interest, despite their lack of economic or other personal interests, if Congress has appropriately authorized such suits. See especially *Oklahoma* v. *Civil Service Comm'n,* 330 U. S. 127, 137–139. Compare *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 125–127. I would adhere to that principle.[21] Any hazards to the

---

[21] My premise is, as I have suggested, that non-Hohfeldian plaintiffs as such are not excluded by Article III from the jurisdiction of the federal courts. The problem is therefore to determine in what situations their suits should be permitted, and not whether a "statute constitutionally could authorize a person who shows no case or controversy to call on the courts . . . ." *Scripps-Howard Radio* v. *Comm'n,* 316 U. S. 4, 21 (dissenting opinion). I do not, of course, suggest that Congress' power to authorize suits by

proper allocation of authority among the three branches of the Government would be substantially diminished if public actions had been pertinently authorized by Congress and the President. I appreciate that this Court does not ordinarily await the mandate of other branches of the Government, but it seems to me that the extraordinary character of public actions, and of the mischievous, if not dangerous, consequences they involve for the proper functioning of our constitutional system, and in particular of the federal courts, makes such judicial forbearance the part of wisdom.[22] It must be emphasized

---

specified classes of litigants is without constitutional limitation. This Court has recognized a panoply of restrictions upon the actions that may properly be brought in federal courts, or reviewed by this Court after decision in state courts. It is enough now to emphasize that I would not abrogate these restrictions in situations in which Congress has authorized a suit. The difficult case of *Muskrat* v. *United States*, 219 U. S. 346, does not require more. Whatever the other implications of that case, it is enough to note that there the United States, as statutory defendant, evidently had "no interest adverse to the claimants." *Id.*, at 361.

[22] I am aware that there is a second category of cases in which the Court has entertained claims by non-Hohfeldian plaintiffs: suits brought by state or local taxpayers in state courts to vindicate federal constitutional claims. A certain anomaly may be thought to have resulted from the Court's consideration of such cases while it has refused similar suits brought by federal taxpayers in the federal courts. This anomaly, if such it is, will presumably continue even under the standing doctrine announced today, since we are not told that the standing rules will hereafter be identical for the two classes of taxpayers. Although these questions are not now before the Court, I think it appropriate to note that one possible solution would be to hold that standing to raise federal questions is itself a federal question. See Freund, in E. Cahn, Supreme Court and Supreme Law 35 (1954). This would demand partial reconsideration of, for example, *Doremus* v. *Board of Education*, 342 U. S. 429. Cf. *United States* v. *Raines*, 362 U. S. 17, 23, n. 3; *Cramp* v. *Board of Public Instruction*, 368 U. S. 278, 282; *Baker* v. *Carr*, 369 U. S. 186, 204.

that the implications of these questions of judicial policy are of fundamental significance for the other branches of the Federal Government.

Such a rule could readily be applied to this case. Although various efforts have been made in Congress to authorize public actions to contest the validity of federal expenditures in aid of religiously affiliated schools and other institutions, no such authorization has yet been given.[23]

This does not mean that we would, under such a rule, be enabled to avoid our constitutional responsibilities, or that we would confine to limbo the First Amendment or any other constitutional command. The question here is not, despite the Court's unarticulated premise, whether the religious clauses of the First Amendment are hereafter to be enforced by the federal courts; the issue is simply whether plaintiffs of an *additional* category, heretofore excluded from those courts, are to be permitted to maintain suits. The recent history of this Court is replete with illustrations, including even one announced today (*supra,* at n. 12), that questions involving the religious clauses will not, if federal taxpayers are prevented from contesting federal expenditures, be left "unacknowledged, unresolved, and undecided."

Accordingly, for the reasons contained in this opinion, I would affirm the judgment of the District Court.

---

[23] This question was, however, extensively discussed in the course of the debates upon the Elementary and Secondary Education Act of 1965, 79 Stat. 27. See, *e. g.,* 111 Cong. Rec. 5973, 6132, 7316–7318.