CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Successor Trustee of the Jay Morse Ely, Jr., Trust, Plaintiff and Counter Defendant-Appellee,

v.

Frank J. ROAN, Guardian ad Litem herein for W. John Matthias, a minor, et al., Defendant and Counter Plaintiff-Appellant.

No. 79–1447.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1979.

Decided Jan. 11, 1980.

Frank J. Roan, Chicago, Ill., pro se.

Roger B. Harris, Chicago, Ill., for Continental Illinois Nat. Bank.

Before FAIRCHILD, Chief Judge, VAN DUSEN, Senior Circuit Judge * and BAUER, Circuit Judge.

VAN DUSEN, Senior Circuit Judge.

This appeal challenges a February 20, 1979, district court judgment in favor of the plaintiff and counter-defendant, Continental Illinois National Bank and Trust Company of Chicago (Continental), and against the defendants and counter-plaintiffs, Frank J. Roan, Esq., guardian ad litem for five minor descendants of Jay Morse Ely, Jr., who died on February 3, 1974, and as trustee for unborn and unascertained descendants of Jay Morse Ely, Jr., and his three daughters, Angela, Mary and Johanna.[1] The guardian and trustee ad litem asks us to enter a judgment against Continental in an amount not less than the difference between (a) the value of the Grannis Trust (see page 1221) assets when they should have been distributed;[2] and (b) the value of such assets when they were distributed (or, in the alternative, when the interpleader was filed). After careful consideration of appellant's contentions, we affirm for reasons which differ in some respects from those of the district court.

## I.

After receiving assets from his grandmother's estate following her death in 1954, Jay Morse Ely, Jr. established in 1955 the Grannis Trust, of which Continental served as trustee at the time of his mother's death on March 11, 1973, when such trust terminated and its assets became distributable to Ely.[3]

---

* Honorable Francis L. Van Dusen, Senior Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.

1. The counterclaims and cross-claims were filed against various fiduciaries, as noted below at note 7, after the filing of the interpleader action based on 28 U.S.C. § 1335 had been determined by transfer of the trust assets to the Northern Trust Company (see page 1221). Although Angela Ely Matthias, as well as the guardian ad litem and trustee, filed an appeal, that appeal was withdrawn on her own motion in June 1979.

2. We note that the value of the Grannis Trust assets was greater on the date they were distributed to First National as the result of this suit brought by Continental than at the time the last income beneficiary (Ely's mother) died, so that using the date of actual distribution will not produce any damages for the guardian and trustee ad litem (see page 1221).

3. The terms of the trust included these provisions:

"(i) That all trusts created thereunder were to be in effect for the life of Ely's mother, Mrs. Grannis, and terminate upon her death (Article II);

"(ii) By the terms of the Grannis trust, the first $6000 of income per year was to be distributed to Ely's mother, Mrs. Grannis; the balance was to go to Ely (Article IV.A.);

"(iii) Upon the death of Ely's mother, all of the principal and accrued income of the trust estate would be distributable to Ely or to his estate if he predeceased his mother (Article IV.B.);

"(iv) 'No interest hereunder shall be transferable or assignable by any beneficiary or be subject to the claims of the beneficiary's spouse or creditors.' (Article V.C.);

"(v) 'The trustee . . . is hereby expressly authorized and empowered in its sole and absolute discretion:

'A. To purchase or otherwise acquire and to retain in trust, whether originally part of the trust estate or subsequently in any manner acquired, . . . securities . . ., as it may deem advisable, whether or not such investments be of the character permissible for investments by fiduciaries, or be unsecured, unproductive, underproductive, overproductive or of a wasting nature. Investments need not be diversified and may be retained with a view to a possible increase in value . . .

'B. During the lifetime of the Settlor and without express prior consent in writing from the Settlor, the trustee then acting hereunder shall neither sell, pledge, mortgage, transfer, exchange, convert, replace, substitute for,

The First National Bank of Chicago (First National Bank) is the trustee under an agreement providing two trust funds collectively known as the Jay Morse Ely Family Trusts, Trust No. 51768, established on September 25, 1958, pursuant to a divorce settlement agreement between Ely and Louise Stanley [Ely] Pester (Pester), his first wife. Ely, by his marriage with Pester, was father of three daughters: Angela Ely Matthias, Mary Ely Connell and Johanna L. Ely. Ely was divorced in 1958 and subsequently married Genevieve Uttere Ely.

On September 25, 1958, Ely and Pester entered into a written contract in anticipation of a possible divorce between them which provided in part:

(a) that Ely would establish at First National Bank certain trusts to be known as the Jay Morse Ely Family Trusts;

(b) that Ely would dispose of the principal and accrued income of the Grannis Trust following its termination in the following manner:

"Ely agrees that, if his mother, Josephine H. Grannis, predeceases him, upon his mother's death to charge, transfer, assign and set over the property, both principal and income, which is distributable to him at his mother's death under the Grannis Trust Agreement to the acting trustee under the trust agreement mentioned in the next preceding paragraph [Jay Morse Ely Family Trusts] to be held and disposed of as provided for in said agreement";

(c) that said agreement was binding upon and inured to the benefit of the heirs, executors, administrators, personal representatives and assigns of Ely.

On the same day, Ely and First National, as trustee, executed a trust agreement naming Ely's first wife and three daughters as life beneficiaries and the descendants of the daughters as remaindermen. This agreement contained this clause:

" . . . [I]f my mother, Josephine H. Grannis, predeceases me, upon my mother's death, I hereby agree to charge, transfer, assign and set over to the trustee then acting hereunder the property, both principal and income, which is distributable to me at my mother's death under the Grannis Trust Agreement . . . ."

Also, on September 25, 1958, a divorce decree was entered dissolving the marriage of Ely and his first wife. This decree approved the abovementioned divorce agreement. In February 1968, Continental received a copy of the divorce settlement agreement.

On July 22, 1968, Roland L. Kemp was appointed conservator of Ely's estate. Kemp remained conservator until Ely's death on February 3, 1974, and became his executor in San Diego County, California, on April 5, 1974. Ely's mother died March 11, 1973, and Ely died on February 3, 1974. During this period, Ely's assets were handled by Kemp, the conservator. Kemp refused to sign a transfer document of the Grannis Trust assets to First National or anyone else, since Ely was dissatisfied with the 1958 divorce settlement and the second Mrs. Ely was not anxious to assign these assets to the First National trusts. First National received from Continental a list of the Grannis Trust assets in June 1973 and sent a draft of an assignment and transfer of such assets from Ely to First National in July 1973, which draft was approved by Continental. In early August 1973, this document was sent to Kemp with the re-

nor otherwise dispose of, nor grant options with respect to, any and all property, at any time during the lifetime of the Settlor forming a part of the trust estate

To the extent that any such requirement can legally be waived, no trustee acting under this agreement shall ever be required . . in the absence of breach of trust to account to any court, or to obtain the order or ap-

proval of any court, in the exercise of any authority, power or discretion herein given.' (Article VI)

"(vii) 'This agreement shall extend to and be binding upon the executors, administrators and assigns of the Settlor and upon the successors in trust (one or more) to the Trustee.' (Article XIV)"
(A101–102).

quest that it be executed by both Kemp and Ely. On August 1, 1973, lists of the Grannis Trust assets were sent to Kemp and Ely. No suggestions were made to Continental by Ely, Kemp or First National concerning changes in the Grannis Trust assets.

On or about November 1, 1973, Kemp said he had no authority to execute the assignment without approval of the California court, but Kantor (an officer of First National) testified that Kemp indicated to him that the executed assignment would be forthcoming. Kantor informed Barnes, a trust officer of Continental, of his conversations with Kemp. Negotiations were carried on in 1974 between the second Mrs. Ely and Ely's daughters in an effort to avoid transfer of these assets to the 1958 trust and to secure agreement on a division of such Grannis Trust principal free of trust restrictions. In June 1974, Continental filed the federal interpleader action to determine the persons entitled to the trust assets. No execution was ever made by Ely or Kemp of any assignment, or approval of transfer, of the Grannis Trust assets prior to the June 1974 filing of the federal interpleader suit by Continental.

Because Continental left it up to First National to secure an executed assignment of the trust assets to the 1958 Family Trusts, the district court used this language, in one paragraph of its 20-page bench opinion, which is relied on by appellants as requiring reversal of the judgment:

"The Continental should, I believe, have been in touch directly with Ely after the death of Mr. Grannis. I think that Continental did indeed treat the matter in a rather informal way. A letter should have been written to Ely. He should have been asked specifically what he wanted to do. If he did not answer the letter, there should have been a telephone call made. Someone from Continental could have gone out there to California, gotten on an airplane and gone to California and talked with Ely, talked with Kemp. None of that was done."

However, that opinion also contained these findings and conclusions, which are supported by the record:

(1) There is no showing that if Continental had promptly approached Ely, he would have approved delivery of the assets to the First National.

(2) There was no bad faith or self-dealing by Continental, and any omission to act by it did not harm Ely, the remainder beneficiary, or the 1958 Family Trust.[4]

(3) Kemp was negotiating on behalf of the second Mrs. Ely and would not have taken any action to approve the transfer of these assets unless it was authorized by the California probate court administering Ely's estate.[5]

(4) Even if Continental had made more inquiries of Ely and Kemp in 1973 and the date on which a lawsuit was filed had been accelerated, such lawsuit might still be pending because agreement on the transfer to a trustee might have been contested. It is only from hindsight it is known that such a contest did not develop, but a suit would not have appeared "to be the desirable way to bring this matter to a head" in 1973.[6]

---

4. See note 2 above. The trial judge's findings that Continental was justified in not making distribution or filing the interpleader action prior to 6/24/74 are supported by the record.

5. In negotiating with Ely's daughters on the second Mrs. Ely's behalf, Kemp had suggested dividing the Grannis Trust principal assets "50–50," thereby increasing her share above what she would have received under the 1958 trust. Kemp wrote these daughters on January 14, 1974 (prior to their father's death) and February 18, 1974, proposing such a division of assets (A114).

6. A84–85. At this point in its opinion, the district judge concluded that the sole duty of Continental was to Kemp as conservator of Ely and later as executor of his estate (A86). The opinion contains this wording at A87–88:

"... I do not understand how a trustee could have authority to file a lawsuit whose objective was to vindicate rights which are being asserted by third parties, which rights in no way enhance the estate of the beneficiary of the trust. It seems to me that the Continental would have been acting as a volunteer had it filed this suit ... at the time [1973] that plaintiffs suggested it should have. As a volunteer, I think there would

(5) The counter-plaintiffs did not consider the transfer of the Grannis Trust assets to First National as urgent prior to approximately June 1974, when the transfer to the temporary receiver (Northern Trust Company) was made.[7]

(6) The district court included this wording in its opinion:

"[I]t was the duty of the trustee to exhaust all reasonable possibilities of settlement without resort to litigation before filing such a suit. One may argue that the suit should have been filed sooner after Kemp's demands than it was, but there is no evidence here that there was any undue delay."

On February 5, 1974, First National made a written demand on Continental to transfer the Grannis Trust assets to it as trustee under the September 25, 1958, trust. These assets were transferred to the Northern Trust Company as the court-appointed receiver in 1974, after the district court action was filed. Pursuant to a September 22, 1976, district court order, all but approximately $75,000. of these assets were distributed to First National as trustee of the 1958 Family Trusts.[8]

The approximate value of the assets on these dates were as follows:

| Date | Total Value | Value of Mobil & Standard Oil Stock | Capital Gain if Oil Stock Sold |
|---|---|---|---|
| 3/11/73 (death of Mrs. Grannis) | $653,063. | $599,948.20 | $186,139. |
| 2/3/74 (death of Ely) | 596,433. | 556,550.68 | 172,972. |
| 6/24/74 (date district court action filed) | 545,643. | | |
| 9/30/76 (date assets distributed to First National) | 727,917. | | |

## II.

Although the district court concluded that appellants did not have, in June 1974 after Ely's death, standing to obtain a surcharge against Continental, as opposed to an accounting of its management of the trust, we have decided that on this record Ely's daughters and the guardian ad litem and trustee had such standing under the applicable federal cases.[9] See *Ass'n of*

---

have been a substantial question as to whether it was acting in the best interest of its own beneficiary and certainly a substantial question as to whether it would be left with any legal fees necessitated by that action.

"Finally, Kemp made it clear that he was not going to turn over the assets to the First National and demanded that Continental give the assets to him. . . . [A]t that time, . . . the Continental filed this interpleader suit.

"Shortly after the suit was filed, the assets which would have gone to Kemp, had the Continental acceded to his demands, went to the First National. It seems to me that in filing the suit rather than simply turning over the assets to Kemp, that Continental did it . . . in a way that resulted in a benefit to these plaintiffs. If the assets were in California, being claimed by the Estate of Ely, being administered in California, the beneficiary of which I take it is the second Mrs. Ely, I think these plaintiffs would have had a long row to hoe to retrieve these assets and they would have been embroiled in litigation in California."

7. At A89, the court said:

"[I]t is quite apparent that if the stock had not dropped in value, no lawsuit would have been filed, and the idea that Continental had acted negligently would have entered no one's mind. What happened here is that the stock did drop in value and a scapegoat is being sought. I do not think there is any scapegoat here. I think that everybody treated this question of the distribution of the trust as something that would be worked out in due course, as a matter of no pressing urgency."

8. The first counterclaim against Continental and cross-claim against Kemp, as executor of Ely's estate, was filed by Louise Pester (Ely's first wife) and First National on July 22, 1974. The second such pleading was filed on October 29, 1974, by Ely's three daughters. On November 14, 1974, Roan, as guardian ad litem for Ely's five grandchildren and as trustee for Ely's unborn and unascertained descendants, filed a counterclaim against Continental, a cross-claim against Kemp, and a cross-claim against First National. Two years later, on October 27, 1976, one daughter and the five grandchildren filed amended counterclaims and cross-claims.

9. We note that during the period Kemp was negotiating with the daughters and their attorney concerning his alternate suggestion that the Grannis Trust principal be distributed to the second Mrs. Ely and the daughters, he notified them, at least as early as February 1974, that Continental "desires to distribute the Grannis Trust assets as soon as possible" (Cont. Ex. 309–311).

*Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). Since appellants were beneficiaries of a trust which had a contract right under the divorce agreement to this principal, the dispute would be presented by them "in an adversary context and in a form historically viewed as capable of judicial resolution." The appellants had a "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498–99 & 501, 95 S.Ct. 2197, 2205 & 2206, 45 L.Ed.2d 343 (1975); see also *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

■ The issue of standing is to be determined by the allegations of the pleadings, rather than the proofs at trial. The pertinent pleadings are the counterclaims and cross-claims filed by Ely's daughters, Angela, Mary and Johanna, and by Ely's grandchildren, W. John Matthias, Daniel R. Matthias, Leslie L. Connell, Charles G. Connell and Mary H. Connell (see note 7). The counterclaims and cross-claims allege that Kemp and Continental wrongfully refused to assign the principal and accrued income of the Grannis Family Trust to First National as trustee for the Jay Morse Ely Family Trusts, despite written demands for such an assignment. The counterclaimants and cross-claimants request the court to direct an assignment of the principal and accrued income of the Grannis Trust to First National, a distribution of the Grannis Trust principal and accrued income to First National, an accounting by the trustees, and to assess a surcharge against Continental for damages resulting from its failure to perform promptly its duty as trustee of the Grannis Trust.

As stated earlier (see page 1219), in 1958 Ely agreed that upon his mother's death he would transfer the assets he received from the Grannis Trust to the Ely Family Trusts. According to the terms of the Family Trusts, which are incorporated in the counterclaims and cross-claims, the daughters, Angela, Mary and Johanna, are beneficiaries of one-third of the trust income during the life of Ely and his second wife. After Ely's second wife's death, the other two-thirds of the trust income and the Grannis Trust assets are to be distributed to the Ely Family Trusts, under which the three daughters are life beneficiaries and their descendants, represented in this litigation by Roan, are remaindermen. From these facts it appears that the interests of the daughters and their descendants might have been prejudiced by the delay in Continental's failure to transfer the assets more promptly so that they could be made available to First National, thereby permitting payments to the income beneficiaries and changes of investments in a fluctuating market.

Further, as mentioned above (see note 3), under the terms of the Grannis Trust the principal and accrued income would be distributable to Ely upon the death of his mother. When Ely, in 1958, agreed in writing to assign the property he would receive from the Grannis Trust to the Family Trusts, this agreement, in effect, meant that the Family Trusts held a third-party beneficiary contract right against Ely, the remainder beneficiary of the Grannis Trust. This contract right matured when the Grannis Trust terminated.

Here the Family Trusts essentially are trying to reach the interest held by Ely, now deceased, as beneficiary of the Grannis Trust. The beneficiaries of the Family Trusts, the holders of contract rights here, are the individuals whose standing is at issue in this case. As beneficiaries of Ely's 1958 agreement, they, of course, have a direct stake in preserving and protecting the assets of that trust.

*Loeb v. Loeb*, 261 Ind. 193, 301 N.E.2d 349 (1973), lends further support to the contention that Ely's daughters and grandchildren have standing. There a wife, in an attempt to satisfy her alimony claim, sought to reach her husband's interest in a trust under which she was not a beneficiary. The court specified that an alimony claimant cannot reach the spouse's beneficial interest in a trust "*unless and until he has rights to the trust funds.*" *Id.* at 200, 301 N.E.2d at 353 (emphasis in original). In

the case at bar, Ely's rights to the assets of the Grannis Trust did not mature until his mother died. Therefore, prior to the death of Ely's mother, the Family Trusts could not reach Ely's beneficial interests in the Grannis Trust. Once Ely's mother died, however, Ely's rights matured. At that time the Family Trusts and their beneficiaries, Ely's daughters and grandchildren, could reach Ely's interest in the Grannis Trust.

In view of the direct financial interests asserted by Ely's daughters and grandchildren in the Grannis Trust assets, and the contract relationship between the Family Trusts and Ely, we believe that the daughters and the grandchildren, through their guardian ad litem, had standing to file the counterclaims and cross-claims in this case.

### III.

■ Appellants contend that Continental breached its duty as trustee by failing timely to distribute the assets of the Grannis Trust.[10] Although a trustee has a duty to wind up the trust and make distribution of the trust property as soon as it can reasonably do so, "[t]he trustee is entitled to take such time and such steps as are reasonably necessary for the protection of the interests of the beneficiary and for the trustee's own protection." See Restatement of Trusts (Second), § 345, comment e, p. 195. The rule is further amplified in that comment by this wording:

"The duty of the trustee is to proceed to wind up the trust within such time as under all the circumstances is reasonably required for the purpose. Where the estate is large . . ., where the ascertainment of the beneficiaries entitled to distribution or the amounts to which

they are entitled is difficult, the period of winding up the trust may properly be longer than it would be in the absence of these circumstances. See § 344, Comment a."

Comment a of § 344 of the Restatement of Trusts (Second) contains this language at page 191:

"Although the time for the termination of the trust has arrived in accordance with the terms of the trust, the trustee does not thereby necessarily cease to be trustee, but he continues to be trustee until the trust is finally wound up. The period for winding up the trust is the period after the time for termination of the trust has arrived and before the trust is terminated by the distribution of the trust property. This period may properly be longer or shorter, depending upon the circumstances. Where . . . the ascertainment of the beneficiaries entitled to distribution or the amounts to which they are entitled is difficult, the period of winding up the trust may properly be longer than it would be in the absence of these circumstances."

See also *Breen v. Breen*, 411 Ill. 206, 103 N.E.2d 625, 628, quoting the above wording.

■ After careful consideration of the trial judge's factual findings and the record, we have been unable to find any reversible error in the district court's conclusion that there was no breach of Continental's duties as defined by the above authorities. In relying on the principle that the period of winding up the trust may be longer than usual if it is difficult to ascertain the beneficiaries, we do not mean to imply that the trustee is relieved of the duty to act diligently to attempt to deter-

---

**10.** Insofar as the claim against Kemp, as executor of the Estate of Ely is concerned, it was settled by a payment of $10,000. by that estate. We note that the trial judge used this wording in his July 30, 1979, Opinion on Petition for Fees and Costs (page 2 of Exhibit 2 of Supplemental Brief filed by appellant on 10/22/1979):

"The counterclaim against Continental did not benefit the Trust Fund in any way. In our view, the counterclaimants were confused as to what their theory was. They

seemed to alternate between the contention that Continental should have turned the Fund over to Ely or Kemp and the contention that it should have turned the Fund over to the First National without permission from Ely or Kemp. We believe the first alternative would have resulted in the depletion or loss of the Fund and that the second alternative would have breached the terms of the Grannis Trust."

mine the proper beneficiaries. We hold only that on the facts presented by this record, particularly in light of the communications between Continental, First National and Kemp during the summer and fall of 1973, and the negotiations between the second Mrs. Ely, the Ely Estate and Ely's daughters in the winter and spring of 1974, the district court was not clearly erroneous in finding that, in June 1974, Continental had not breached its duty to wind up the trust within a reasonable amount of time.

Liability for a breach in the trustee's duty to convey trust property to the remaindermen only arises if the breach "occurred after the trustee had unreasonably delayed in making the conveyance." See Restatement of Trusts (Second), § 345, Comment f. Because we conclude that there was no breach of Continental's duty to convey the trust property in a timely fashion, we need not reach the issue of liability for any depreciation in the value of such property prior to June 1974. Also, we believe that the facts of this case reveal that Continental's actions did not result in any damages. As mentioned above (see page 1221), the assets of the Grannis Trust were valued at $653,063. at the time prescribed for termination of that trust (see note 3 above), had dropped to $596,433. at the death of Ely, but had risen to $727,917. at the date of actual distribution to First National.

Furthermore, we note that Ely and Kemp, by their conduct, consented to Continental's continued holding of the Grannis Trust assets until the interpleader action was filed and that they never suggested any change being made in these assets. See *Croslow v. Croslow*, 38 Ill.App.3d 373, 377, 347 N.E.2d 800, 803 (5th Dist. 1976).

For the foregoing reasons, the judgment of the district court will be affirmed.