**REVISED FEBRUARY 18, 2009**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 12, 2009

Charles R. Fulbruge III
Clerk

No. 07-20740

RANDOLPH D GALE; DEBRA E GALE, Co-Trustees of the Gale 2000 Trust

Plaintiffs - Appellees

v.

ALAN G CARNRITE; CARNRITE REAL ESTATE HOLDINGS LLC

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges.

Leslie H. Southwick, Circuit Judge:

Alan G. Carnrite and Carnrite Real Estate Holdings, LLC ("Carnrite") appeal the district court's grant of summary judgment in favor of Randolph D. Gale and his wife, Debra E. Gale, as Co-Trustees of the Gale 2000 Trust ("the Gales"), on the Gales' breach of contract claim. The Gales cross-appeal the ruling on attorneys' fees. For reasons we explain below, we REVERSE and RENDER judgment for Carnrite and his company and deny the cross-appeal.

## I. Factual and Procedural Background

In 1999, the Gales expressed interest in purchasing for the Gale 2000 Trust a condominium unit located in San Jose del Cabo, Baja California Sur, Mexico. The condominium was owned by Villa Rayos Del Sol, LLC, a Nevada limited-liability company. Carnrite owned all of the outstanding membership interest in Villa Rayos.

Upon making an offer, the Gales were informed that due to legal restrictions on non-Mexican ownership of real property in the area,[1] they would not be able to purchase the condominium directly. Instead, they would be required to purchase the outstanding membership interest in Villa Rayos, which was the beneficial owner of a leasehold interest in the condominium under a Mexican Bank Trust arrangement known as a *fideicomiso*.[2] Villa Rayos's sole asset was the beneficial interest in the condominium. Its only purpose was to serve as the beneficiary of the *fideicomiso*.[3]

In December 1999, the Gales, as buyer, and Carnrite, as seller, executed an agreement, entitled "Joint Escrow Instructions of Seller and Buyer, and Agreement for Sale of Membership Interest in Villa Rayos Del Sol, LLC" (the "Agreement"). The Gales agreed to purchase all of the membership interest in

---

[1] Under Article 27 of the Constitution of Mexico, only Mexicans by birth or naturalization or Mexican companies may "acquire direct ownership of lands or waters within a zone of one hundred kilometers along the frontiers and of fifty kilometers along the shores of the country."

[2] A *fideicomiso* is a property-ownership arrangement complying with Article 27 of the Mexican Constitution under which a Mexican Bank Trust obtains legal title to a piece of real property within a prohibited zone, and a foreigner, as the beneficiary of the trust, enjoys the beneficial interest in the property, including all the usual rights of ownership.

[3] Villa Rayos was formed in 1996. Its original members and owners were the Sonenshine Family Trust and Sheila Prell Sonenshine, Trustee UWO Milton Prell. The Sonenshine entities had previously purchased the beneficial interest in the *fideicomiso* from the condominium's developer in 1991 for $715,000, and subsequently transferred the beneficial interest to Villa Rayos upon its formation in 1996. In February 1999, Carnrite purchased all of the outstanding membership interest in Villa Rayos for $1,725,000.

Villa Rayos for $2,125,000. The Agreement included a warranty by Carnrite that as of the date of closing, "the LLC has and will have no liabilities of any nature[,] . . . including without limitation tax liabilities due or to become due." The Gales and Carnrite completed the purchase in January 2000. Neither Carnrite nor anyone else reported the transaction to the Mexican government; no Mexican income or capital gains taxes were paid on the transfer.

The Gales used the condominium for a number of years before deciding to place it back on the market. In 2005, the Gales attempted to sell the outstanding membership interest in Villa Rayos to James S. Vaudagna and the Josephine Vaudagna Trust, but the Vaudagnas were not willing to purchase the membership interest in Villa Rayos. Accordingly, in September 2005, Villa Rayos, through the Gales, sold the Vaudagnas the beneficial interest in the *fideicomiso* itself for $2,400,000. A substantial Mexican capital gains tax liability resulted, determined by using the basis of the *fideicomiso* from 1991.

The Gales first filed and then dismissed a suit against Carnrite in the U.S. District Court in Nevada. In December 2005, the Gales filed suit in the United States District Court for the Southern District of Texas, asserting a cause of action for breach of contract. The Gales alleged that Carnrite breached their contractual warranty by failing to report to the Mexican authorities and pay taxes on the Carnrite-Gale transaction. Carnrite filed two separate motions for summary judgment, both of which the district court denied.

The court conducted a bench trial pursuant to Federal Rule of Civil Procedure 44.1 to determine the applicable Mexican law. The court heard testimony from expert witnesses for both sides. The court later ruled that the Carnrite-Gale transaction gave rise to a tax liability under Mexican law.

The district court then granted summary judgment to the Gales. The court held that Carnrite breached the Agreement's warranty provision because "at the time of closing, Villa Rayos had a built-in capital gains tax liability equal

to the difference between the Gales' purchase price and the original adjusted basis." The court further rejected Carnrite's argument that even if there was a breach, the Gales' claim should fail because the Gales' damages were caused by their decision to sell the beneficial interest in the *fideicomiso* rather than the membership interest in Villa Rayos. The court explained that in its Rule 44.1 ruling, it held, as a matter of law, that the sale of the shares in a *fideicomiso* is a taxable event; thus, the Gales would have been subjected to Mexican taxes regardless of the manner in which they structured the transaction.

Carnrite now appeals, arguing that the district court erred in denying its motions for summary judgment, granting the Gales' motion for summary judgment, finding as a matter of law that the Carnrite-Gale transaction gave rise to Mexican tax liability, and denying its post-trial motions.[4] The Gales cross-appeal the district court's order on their motion for attorneys' fees.

## II. Discussion

We review a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008). Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A.    *Standing*

---

[4] Carnrite's notice of appeal also stated that the appeal was from the district court's order denying its motion to compel production of the Gales' tax returns and proof of payment documents from the United States and Mexico for the time periods relevant to this suit. Other than mentioning this motion and its denial in the facts section of its brief, Carnrite does not present any argument or authority on this issue. As such, Carnrite has waived this issue. *Jason D.W. ex rel. Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 210 n.4 (5th Cir. 1998) ("We have held that the failure to provide any legal or factual analysis of an issue on appeal waives that issue." (citations omitted)).

As a threshold matter, we must determine whether the Gales have standing to pursue their claim. Questions of jurisdiction, like standing, are reviewed *de novo. Bonds v. Tandy*, 457 F.3d 409, 411 (5th Cir. 2006). Carnrite argues that because Vaudagna directly purchased the beneficial interest in the *fideicomiso* from Villa Rayos rather than purchasing the outstanding membership interest in Villa Rayos from the Gales, the Gales were not liable for the capital gains taxes about which they are complaining. Instead, the entity Villa Rayos, which is not a party to this suit, was accountable for the taxes assessed as a part of the Gale-Vaudagna transaction. Consequently, Carnrite maintains that the Gales have not suffered an injury in fact, and therefore do not have standing to pursue their claim.

The Gales respond by asserting that after the lawsuit was filed, on January 17, 2007, Villa Rayos executed a written agreement assigning to the Gales all of the claims presented in this lawsuit. The assignment stated it was effective as of September 9, 2005. Carnrite does not dispute the usual propriety of this type of assignment. However, it argues that because Nevada revoked Villa Rayos's right to transact business effective May 1, 2004, for its failure to pay its franchise taxes and filing fees and to file its annual reports, Villa Rayos's purported assignment was ineffective. The district court ruled that the Gales had standing to bring this suit because they were parties to the Agreement upon which the suit is based.

Article III standing requires, at a minimum, that "the plaintiff personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts." *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 (5th Cir. 2007). "'The gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for

illumination of difficult . . . questions.'" *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1986)) (additional internal quotation marks and citation omitted).

Although the Gales were clearly a party to the agreement allegedly breached in this case, Carnrite argues that Villa Rayos incurred the injury caused by such breach. In documents entitled "Seller's Settlement Statement" and "Disbursement Instructions for Funds Held in Escrow," which list substantial capital gains taxes as one of the fees to be paid as a part of the Gale-Vaudagna transaction in 2005, the seller of the beneficial interest in the *fideicomiso* is listed as "Villa Rayos del Sol, LLC represented by Randolph D. Gale and Debra Gale." Additionally, in his affidavit testimony, Randolph Gale discusses the 2005 tax liability in somewhat ambiguous terms, stating "we, through the LLC, became liable for additional capital gains taxes . . . ," and "we were required to pay Mexican capital gains taxes . . . ."

Regardless of these technical issues, it is clear that the payment of such taxes inevitably fell on the Gales. It is uncontested that Villa Rayos had no assets or income from which to pay the taxes. Villa Rayos's sole asset was the beneficial interest in the *fideicomiso* being transferred. The Gales were Villa Rayos's sole members.

Moreover, Carnrite's argument that Villa Rayos's assignment was ineffective is foreclosed by Nevada law regarding permissible conduct by a limited-liability company whose right to transact business has been revoked. One Nevada statute provides that after the charter of a limited-liability company is revoked, "the property and assets of the defaulting company must be held in trust by the managers," and dissolution proceedings under other statutes should be pursued. Nev. Rev. Stat. § 86.274. Another statute allows a dissolved limited-liability company to dispose of its property and wind up its affairs:

> The dissolution of a limited-liability company does not impair any remedy or cause of action available to or against it or its managers or members arising before its dissolution and commenced within 2 years after the date of the dissolution. A dissolved company continues as a company for the purpose of prosecuting and defending suits, actions, proceedings and claims of any kind or nature by or against it and of enabling it gradually to settle and close its business, to collect and discharge its obligations, to dispose of and convey its property, and to distribute its assets, but not for the purpose of continuing the business for which it was established.

*Id.* § 86.505. A final relevant provision is that after dissolution, the assets may be distributed to its members. *Id.* § 86.521.

Accordingly, when Villa Rayos's right to transact business was forfeited in May of 2004, the Gales held its property and assets in trust. Among the assets unimpaired by the dissolution was any cause of action against Carnrite. Moreover, the Gales were permitted to transfer those assets to themselves as the company's only remaining members.

As the parties inevitably injured by the alleged breach, and the assignees of Villa Rayos's claims, the Gales have standing to pursue this action.

B.      *Breach of the Agreement*

The Gales maintain that Carnrite breached the warranty provision of the Agreement when it failed to report to the Mexican authorities and pay taxes on the Carnrite-Gale transaction in January 2000. The argument continues that the tax liability then passed to Villa Rayos, which ultimately had to pay the taxes as a part of its 2005 sale to Vaudagna. Carnrite responds, however, that the 2000 sale was not a taxable event under then-applicable Mexican tax law. Even if it was a taxable event, any resulting tax liability would fall solely upon Carnrite and not upon Villia Rayos, as required for liability under the language of the Agreement. We find our issues thus to be (1) whether the 2000 transaction was a taxable event under the then-existing Mexican tax law, and

if so, (2) whether Carnrite's failure to pay such taxes created a tax liability for Villa Rayos within the language of the Agreement.

1. *Was the 2000 transaction a taxable event under then-existing Mexican tax law?*

After conducting a hearing on this issue under Rule 44.1 of the Federal Rules of Civil Procedure, the district court concluded that the Carnrite-Gale transaction in 2000 was a taxable event under Article 190[5] of the Mexican tax code applicable at the time of the transaction. Carnrite maintains that the court's interpretation of Mexican law is incorrect. According to Carnrite, the exchange of a nonresident limited-liability company's shares did not generate tax liability under the version of Article 190 in effect at the time of the 2000 transaction if the value of the shares derived from an indirect interest in Mexican real property, as through a *fideicomiso*. The provision was amended in 2004 to create tax liability in such situations.

We do not resolve this issue. As we will discuss, even if the transaction in 2000 was a taxable event, the Gales have not shown that Carnrite's failure to pay such taxes resulted in a liability for Villa Rayos. As such, the Gales' breach of contract claim fails under either interpretation of the Mexican tax law.

2. *Did Carnrite's failure to pay taxes on the 2000 transaction create a tax liability for Villa Rayos within the language of the Agreement?*

Because we have assumed in our analysis that the 2000 transaction was a taxable event, we must determine whether Carnrite's failure to report or pay taxes on the transfer created a tax liability for Villa Rayos. The district court did not answer this particular question. Instead, the court focused on a different potential breach. Relying on Fifth Circuit caselaw, the court concluded that "Villa Rayos had a liability because it had an interest in an asset that had

---

[5] The Mexican statute was at some point codified as Article 151 and then was officially renumbered as Article 190. Our reference to Article 190 will include, as appropriate, the prior version of the statute.

appreciated significantly over the original, adjusted basis for which it faced capital gains tax liability." The court thus held that "[b]ecause the Gales were assured by the contract that Villa Rayos had no liability 'of any nature,' that contract was breached."[6] We see some difficulties with the district court's approach. No party argues that the court's specific reasoning should be sustained. The Gales expressly abandoned the district court's low-cost basis theory at oral argument, explaining that they were relying solely on their contention that a breach occurred when Carnrite failed to pay taxes on the 2000 transfer. Because of its abandonment by the parties, we do not review the district court's legal analysis.

To understand what is argued, we examine Section 3.01(h) of the Agreement, which contains the warranty provision at issue:

ARTICLE 3. WARRANTIES OF SELLER

Section 3.01. Seller hereby warrants, represents and covenants to Buyers and each of them, and this agreement is made in reliance on the following, each of which is deemed to be a separate covenant, representation and warranty:
. . . .
(h) As of the date of these Instructions, and at the date of the Closing the LLC has and will have no liabilities of any nature, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, known or unknown, including without limitation tax liabilities due or to become due, and incurred in respect of or measured by the LLC's income for any period up to such date, or arising out of transactions entered into, or any state of facts existing prior thereto, except as set out on Exhibit "C" attached hereto.

---

[6] Presumably, Carnrite could have avoided liability under this theory by including a representation regarding Villa Rayos's cost basis in the *fideicomiso* as Exhibit C to the Agreement. Though the warranty provision mentions an Exhibit C, there was apparently no such exhibit attached to the Agreement in its final form.

As just quoted, what has been warranted is that the "LLC" will not have liabilities. Section 1.01 of the Agreement defines the "LLC" as Villa Rayos del Sol, a Nevada Limited Liability Company, and the term is never given a more expansive definition. Thus, although Carnrite and the Gales were the signatories, the Agreement warranted only that Villa Rayos itself would have no tax liabilities at the time of the transfer. Accordingly, we must determine, under Mexican law, whether the LLC was obligated to pay taxes on the 2000 transaction and the effect of any taxes not being paid.

Carnrite and the Gales agree that any tax liability initially fell on Carnrite; their disagreement centers on the effect of Carnrite's failure to report and pay taxes on the transfer. The parties offered conflicting expert testimony on this issue. Mitchell Creekmore, an expert for the Gales regarding capital gains tax liability for foreign buyers of Mexican residential property, testified as follows in his deposition regarding the tax liability resulting from the 2000 transaction:

> Q. Okay. Now, let's talk about the capital gains tax. The capital gains tax then, you believe, would be owed by Carnrite Real Estate Holdings, LLC?
> A. Yes, or Villa Rayos.
> Q. Well – and that's my next question. Would Villa Rayos del Sol, LLC, also owe the capital gains tax?
> A. No. Villa Rayos is the one that sold or transferred to the Carnrites. So that would be the entity. That's the actual beneficiary of the trust[,] right?
> Q. Correct.
> A. Okay.

Carnrite argues that Creekmore's testimony is an admission that if Carnrite failed to pay capital gains taxes in 2000, any liability would fall solely upon Carnrite, not upon Villa Rayos or the Gales. Creekmore's testimony does not take Carnrite where it would like to go. First, Creekmore's testimony concerns only the party obligated for the tax in the first instance, not what happens if

Carnrite, the initial obligor, fails to pay. Second, Creekmore's statements are confusing at best. Creekmore made at most a passing reference to Villa Rayos as being potentially liable for the taxes. Creekmore then explicitly stated that Villa Rayos would not owe any taxes, as it was "the one that sold or transferred to the Carnrites." Actually, Villa Rayos never sold or transferred anything to Carnrite, but its ownership was the subject of the transfer.

Jonathan Pikoff, another expert for the Gales, also testified regarding this issue. During the Rule 44.1 hearing before the district court, Pikoff maintained that the effect of Carnrite's failure to pay Mexican taxes at the time of the sale to the Gales was that "[i]t passe[d] on a liability to the LLC, to the Gales." Pikoff explained that his conclusion flowed from this language in Article 190 itself:[7]

> In the case of acquisitions by nonresidents of shares or security instruments representing the ownership of property to which the first paragraph of this article refers, the tax authorities may perform an appraisal of the transaction in question, and if such appraisal exceeds the contractual consideration for the alienation by more than 10%, the total difference shall be considered income to the alienee, in which case the acquisition cost of the property shall be increased by said total difference.

Mexican Tax, Customs and Foreign Investment Laws ¶4430 (CCH, Inc. 2006) (English translation). When asked to describe this provision in layman's terms, Pikoff explained,

> what they're saying is if the transaction amount is more than 10 percent off from what was declared – in this case nothing was declared, so it's 100 percent – if the seller does not declare his taxes – this is a tough translation here in this version you gave me – but if the seller doesn't pay the tax, then the buyer becomes liable for the tax.

---

[7] As noted above, Article 190 (or Article 151) is the Mexican tax provision through which the Gales assert that the 2000 transaction was a taxable event.

Rodolfo Sanchez-Arellano, Carnrite's expert, however, disagreed with Pikoff's construction of this provision in reference to this case. He testified during the Rule 44.1 hearing that

> this paragraph is applicable just by the tax authorities, then it is very clear what it states. Just in the case the tax authorities make – make a note to the transaction and find out that the operation was not properly agreed on an arm's length basis, in other words, that the fair market value of the stock was higher, and they give a percentage, 10 percent higher than that was agreed. And it is a paragraph that can be applied just by the tax authority. That's the reason why I fully disagree with [Pikoff's] testimony.

He further stated that to the best of his knowledge, the Mexican tax authorities did not audit the 2000 transaction between the Gales and Carnrite. Finally, Sanchez-Arellano opined that Villa Rayos could not be liable for the taxes on the 2000 transaction: "It's just the entity issuing the stock. It cannot be jointly liable. There is no way the tax authorities can claim that it is jointly liable. There is not that statement and that hypothesis under the income tax law nor under the federal tax code."

The applicability of the Article 190 language quoted above to the present case is unclear. Under the provision, the buyer in a sale of stock may incur a tax obligation if the purchase price of the stock is more than 10% below the true value of the stock. The parties have not pointed to any evidence that the Gales purchased the membership interest in Villa Rayos at a deflated price or that the Mexican authorities performed an appraisal of the transfer. Perhaps Pikoff is correct, and some of the seeming inconsistencies between the language of the provision and the facts of this case can be explained as the result of a "tough translation" of the Spanish text. Even so, we have some doubts regarding Pikoff's explanation of the quoted provision and whether it applied to the Carnrite-Gale transaction. Nonetheless, this provision is the only vehicle

through which the Gales have asserted that Carnrite's failure to pay taxes in 2000 created a tax liability for Villa Rayos.

Even assuming Pikoff is correct in his explanation of the provision and its application to this case, the Gales have not shown that Carnrite's failure to report or pay taxes on the transfer created a tax liability for Villa Rayos. Instead, both under Pikoff's analysis and the language of the provision itself, Carnrite's failure to pay resulted in a tax liability for the Gales (the buyer), not Villa Rayos. The warranty provision covered only the tax or other liabilities of the LLC, Villa Rayos. Villa Rayos was neither the buyer nor the seller in the transaction.[8] The 2000 transaction altered the ownership of the membership interest of Villa Rayos, but there is no factual or legal basis shown by this record that Villa Rayos itself became liable for anything or that it would become liable at the default of others.

We find nothing absurd or otherwise deficient in the plain language of the warranty. The seller provided a warranty that the asset being transferred did not itself have any liabilities. If the act of transferring created liabilities or passed on a pre-existing liability of the seller, that risk was not covered by the warranty. A warranty that the buyer was not getting any liabilities of any nature from any source would be a valuable one. We conclude, though, that this warranty did not provide such comprehensive protection.

Because Carnrite's failure to pay taxes in 2000 is the only breach the Gales allege, Carnrite is entitled to judgment on the breach of contract claim.[9]

---

[8] By contrast, in the 2005 transfer, Villa Rayos itself sold the beneficial interest in the *fideicomiso* to Vaudagna. Villa Rayos was the seller, which was the basis for our earlier resolution of the issue of standing. The warranty, though, applied only to the 2000 sale.

[9] In light of this ruling, Carnrite's remaining arguments are moot, including its contention that proof of justifiable reliance is required to recover for breach of an express warranty, that the low-cost basis of a limited-liability company's sole asset does not create a tax liability for the company itself, and that the Gales' claim was barred by the applicable statute of limitations. Similarly, the Gales' cross-appeal of the district court's order on

## III. Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and RENDER judgment for Carnrite.

---

attorneys' fees is also moot.