James K. Bredar, United States District Judge
On January 12, 2017, the United States of America filed a complaint against the Police Department of Baltimore City ("BPD") and the Mayor and City Council of Baltimore ("the City"). (ECF No. 1.) The United States alleged Defendants had engaged in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States. The complaint was brought pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 : Title VI of the 1964 Civil Rights Act. 42 U.S.C. § 2000d : the Omnibus Crime Control and Safe Streets Act of 1968. 42 U.S.C. § 3789d ; and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 - 12134.
The Court subsequently issued an order approving the parties' jointly filed motion seeking entry of a consent decree (the "Consent Decree" or "Decree") to resolve litigation of the instant case. (ECF No. 39, modifying ECF No. 2-2.) The Consent Decree provides for appointment of an independent monitor "to assess and report on whether the requirements of [the consent decree] have been implemented and provide Technical Assistance in achieving compliance." (Consent Decree, ECF No. 2-2 at 159, as modified by ECF No. 39.)
*899 Now pending before the Court is the parties' JOINT MOTION TO APPOINT INDEPENDENT MONITOR. (ECF No. 64.) The Court has fully considered the parties' arguments in support of their jointly proposed monitor candidate and conducted its own independent interview of the proposed monitor and other senior leadership of the proposed monitor team. For the reasons set forth below, the parties' motion will be GRANTED and an ORDER will issue appointing Kenneth Thompson as the Independent Monitor of the Consent Decree.[1]
I. The Requirements of the Consent Decree
In considering Movants' request to appoint the proposed monitor, the Court is guided, as it must be, by the terms of the Consent Decree, which sets forth the process for selecting an independent monitor. (ECF No. 2-2 at 158-61, as modified by ECF No. 39; id. at 159 ("The selection of the Monitor shall be pursuant to a process jointly established by the City, BPD and DOJ....").) The Decree assigns the parties primary responsibility for evaluating the monitor candidates and selecting a proposed candidate, but assigns the Court ultimate responsibility for appointing a fully qualified monitor. In addition, the Decree provides that the public should have the opportunity to offer input at specified times during the selection process.
Under the terms of the Decree, the parties stipulated that they would work collaboratively towards the goal of selecting a jointly agreed upon monitor candidate that is qualified to provide the diverse array of subject matter and technical expertise required by the Decree. Specifically, the Decree provides that "[t]he Parties will jointly select an Independent Monitor ("Monitor"), which will include a team of individuals with expertise in policing, civil rights, monitoring, data analysis, project management, and related areas, as well as local experience and expertise with the diverse communities of Baltimore." (ECF No. 2-2 at 158-59, as modified by ECF No. 39.) The Parties were to "mutually develop[ ]" a "Request for application ('RFA')" that "specif[ied] the criteria upon which the selection for the Monitor shall be made" and required applicants "to submit a proposed budget for the work to be performed under [the Decree]." (Id. at 159.) The parties also agreed "to file a joint motion asking the Court to appoint the Monitor chosen by the Monitor selection process described herein." (Id. at 159.)
Notably, the Decree also envisions an opportunity for the community to participate in the monitor selection process. (Id. at 159 ("The Parties agree that it is important to allow for public input at each stage of the Monitor selection process.").) For instance, the Decree provides for a "public comment period" following submission of monitor applications "in which members of the public can review candidate information and make recommendations to the Parties about the potential candidates." (Id. ) Additionally, the parties agreed that after finalists were selected for the monitor *900 position, they would "provide an opportunity for [those] candidates to respond to questions and concerns from the Baltimore community" at a "public meeting." (Id. at 160.) The Decree is clear, however, that the "public input" is just that, input; and that the parties, not the public, are responsible for steering the selection process. (See id. at 160 ("[T]he Parties will evaluate the candidates, considering the recommendations made by members of the public, and agree on a subset of the teams to interview."); id. ("[T]he Parties will then agree upon the teams that are finalists for the Monitor role."); id. ("[T]he Parties will agree on a Monitor to propose to the Court in a joint motion.").) Thus, although public input is an important part of the monitor selection process, it is but one ingredient to be considered by the parties in their comprehensive analysis of the monitor candidates prior to selecting a proposed monitor for submission to the Court.
Importantly, the parties' selection is not self-executing under the terms of the Decree. Rather, the Decree makes the Court the final arbiter, requiring court approval and appointment of the monitor. (Id. at 160 ("[T]he Parties will agree on a Monitor to propose to the Court in a joint motion. If the Parties cannot agree on a Monitor, the City/BPD and DOJ may each submit one proposed team to the Court, which will select the Monitor.").) This makes sense because the monitor, although vetted by the parties (with input from the public), is an agent of the Court. (Id. at 161 ("The Monitor will be the agent of the Court and subject to the supervision and orders of the Court, consistent with this Agreement.").) In this regard, the monitor is fully independent of the parties, as he should be. The monitor does not answer to the City, the BPD, or the Department of Justice; the monitor answers only to the Court. Thus, although the Decree largely puts the parties in the driver's seat during the monitor selection process, it is the Court, relying on the parties' expertise and vetting, that is empowered to appoint the Monitor, who will serve as the eyes and ears of the Court in overseeing the implementation and execution of the Consent Decree.
II. The Monitor Selection Process As Actually Executed; Deference
Having reviewed the requirements of the Decree itself, the Court turns to the selection process as actually executed.
The monitor selection process, as outlined above, envisions a specific role for each of the parties and the Court in selecting a monitor. The parties are responsible for evaluating the merits of the potential candidates and then submitting their arguments to the Court in favor of the monitor or monitors they believe best satisfy the terms of the Decree. And the Court is responsible for evaluating the parties' arguments for or against a proposed monitor and ultimately selecting the monitor that the Court believes is best qualified to fulfill the obligations of that role. The Court's decision, as always, is dictated by the law and facts as the Court finds them. In this case, the relevant law by which the Court is constrained is the terms of the Consent Decree, and the relevant facts are the available evidence and data regarding the qualifications of the proposed monitor and team, including the Court's personal interview of the proposed team leadership. In this regard, the monitor selection process is, in many respects, not unlike the process used to resolve the multitude of other, more common disputes brought before federal judges.
The selection process, however, is unique in at least one regard that warrants brief mention. Under the terms of the Decree agreed to by the parties, members of the community-who are not *901 parties to the dispute -were granted a limited, but notable, role in the selection process. Such nonparty participation is not common in our adversarial system and for good reason. The Constitution requires that federal courts exercise their power only over actual "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1 ; see, e.g., Flast v. Cohen , 392 U.S. 83, 94-95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). One corollary of this requirement is that generally only those parties with standing-i.e., "a personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), based on an actual or imminent injury that is likely to be redressed by the relief sought from the court-may participate in the case. Aside from whether or not specific individual members of the public have standing to participate in this dispute-an issue the Court does not reach-nonparty participation presents another, equally concerning problem. In our judicial system, an individual generally "is not bound by a judgment ... in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Hansberry v. Lee, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940). This rule stems from our "deep-rooted historic tradition that everyone should have his own day in court." Richards v. Jefferson Cty., 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996). Thus, allowing excessive participation in litigation by nonparties can raise thorny issues not just with respect to the Court's jurisdiction but also with respect to the rights of those parties.
The Court raises this issue not to sound alarm bells, but rather to highlight the unique, yet narrowly constrained role that the public has been afforded in the parties' dispute. This is no ordinary dispute, and undoubtedly the stakes are significant not only for the parties, but also for members of the community that will feel the most direct impact of the success or failure of the reform measures agreed upon by the parties. Because of the far reaching implications of this case within the greater Baltimore community, the process adopted by the parties, and approved by the Court, allowed for limited engagement and input from nonparties-i.e., the public. Indeed, the Court strongly believes that transparency was a crucial aspect to the monitor selection process and will remain a crucial aspect of the Consent Decree implementation process. And the Court is confident that the public's input was heard and that the monitor and team ultimately selected by the parties are stronger as a result of the community's engagement in the process.
The fact remains, however, that this is the remedy phase of a lawsuit between two adverse panics, and the Court is constrained to act only within that context. The Court is not granted the broad authority given legislatures and elected executives to set policy-rather, just the opposite. The Court is limited by rules of procedure, statutes, the Constitution, and here, very specifically, the terms of the Decree. In other words, the Court does not write on a blank slate and is not free to frame policy or adopt reform measures that the Court (or the public) might think is best under the circumstances. While the Court has conducted its own public hearing and witnessed both public forums and considered the public comments submitted in writing, at the end of the day, the Court must function within the confines of its designated role in our tripartite system of government. This means that the Court must resolve any issue before it, largely as framed by the parties, according to the relevant law and facts. Here, the Court's role is narrowly defined: It must decide whether the parties' jointly proposed monitor candidate was selected in accordance with the terms of the Consent Decree and *902 is qualified to oversee execution of the specific requirements of the Decree.[2]
Accordingly, in deciding whether to approve the parties' proposed monitor and team, the Court is sensitive to the input and views of the public but even more so to that of the parties. This is so not only for the reasons explained immediately above, but also because the Consent Decree demands it. While the Decree implicitly vests final authority to select the monitor in the Court, the clear intention of the parties' agreement is that they be given significant influence over the selection process. As noted, the parties assigned themselves primary responsibility for evaluating the monitor candidates and selecting a qualified individual and team. And the Court is dependent on their expertise and resources in that regard. Moreover, nothing about the parties' desire to lead the process violates statutory or constitutional requirements, nor is it inconsistent with how courts generally operate in the settlement context. Accordingly, the Court believes that deference should be given to the parties' selection.
Of course, the Court is responsible for insuring that the proposed monitor and team are qualified under the terms of the Decree. This means that the proposed candidate must not only have the necessary subject matter and technical expertise, but also be able to dedicate sufficient time and resources to the project and fulfill his obligations within the strict budgetary confines of the Decree. This is no easy task and the Court does not take its role lightly. But where, as here, the parties have agreed on a proposed solution-in this instance the selection of a particular monitor and team-the Court appropriately gives significant deference to that proposal.
III. The Proposed Monitor
Absent any evidence that the parties have mishandled or short-circuited the selection process, it would be inappropriate for the Court to lightly disregard their recommendation. The Court sees no such evidence. Indeed, the Court (which has been involved in the selection process by observing public forums, by offering guidance at the parties' request, and by ultimately personally interviewing the leadership of the proposed monitor team) is impressed with the parties' dedicated, collaborative effort to find the best possible team to oversee this monumental task. Here, the process initially failed to yield a single team that either the parties or the Court believed possessed all the necessary attributes to serve as an effective monitor. (ECF Nos. 60 & 62.) Yet, the parties stayed the course and took the unique step of combining members of two teams,[3] at the suggestion of the Court,[4] to ensure that the team ultimately selected had the requisite combination of leadership, experience, and expertise to oversee what will be an arduous and extended reform process. The Court commends the parties for the diligent and sincere manner in which they carried out *903 the selection process, which the Court finds adhered to all material requirements stipulated by the Consent Decree.
The Court concludes that the parties proposed monitor and team are well-prepared to take on this difficult task. The Consent Decree required the parties to evaluate monitor candidates and select a proposed monitor and team pursuant to specific criteria, including "each team member's experience and qualifications to perform the tasks outlined in [the Decree]; the ability to work collaboratively with BPD and DOJ to enable BPD to reach compliance with [the Decree]; and the ability to do so in a cost-effective manner." (ECF No. 2-2 at 159, as modified by ECF No. 39.)
The parties contend that the proposed monitor and team "satisf[y] each of these criteria and qualifications, and [have] provided a first-year budget that is reasonable and within the budgetary cap set by the Decree." (ECF No. 64 at 4.) The Court agrees. There are substantial indicia from the written application materials, the submissions of the parties, and the Court's own observation of the proposed monitor and team that they are well-positioned to carry out the duties assigned to the monitor by the Consent Decree. The proposed team has a broad array of relevant experience and expertise, both at the national and local level. The proposed monitor, Mr. Thompson, satisfies one of the most important criteria: he is a native Baltimorean with deep ties to a wide swath of the Baltimore community. Mr. Thompson is a seasoned litigator who understands well the role of the monitor and can ably navigate the many challenges, legal and otherwise, sure to arise during the life of the Consent Decree. Moreover, he has an impeccable record in the community, and the Court is convinced, based on its personal interview of Mr. Thompson, that he is fully committed to this undertaking.
Although Mr. Thompson does not have any prior monitoring experience, he has taken what could be perceived as a weakness and turned it into a strength by surrounding himself with an outstanding team. In particular, many of the senior leaders of the team-including Principal Deputy Monitor Charles Ramsey and Deputy Monitors Hassan Aden and Theron Bowman-have previously worked (and continue to do so) as part of monitoring teams responsible for overseeing analogous consent decrees involving the reform of police departments in large metropolitan areas, including Seattle, New Orleans, and Cleveland. Additionally, these same individuals have extensive personal experience in law enforcement and specifically in developing and implementing constitutional and community policing reform programs. For example, Mr. Ramsey has led two major metropolitan police departments, the District of Columbia and Philadelphia, through collaborative reform processes with the Department of Justice.[5] Additionally, he served as the co-chair of President Obama's President's Task Force on 21st Century Policing, which was created to strengthen community policing and trust among law enforcement officers and the communities they serve. The task force produced a report with 59 recommendations and 92 specific action items, many of which have been adopted by police departments around the nation.[6] Dr. Bowman, *904 during his time as Chief of Police for the City of Arlington, Texas, developed and implemented a community policing model known as "geographic policing" under which officers are assigned to specific, narrowly defined areas to facilitate consistency and accountability in police-community relations.[7] And Mr. Aden, as Chief of Police for the City of Greenville, N.C., instituted a program that allowed community members to participate in long-term strategic planning for the police department.[8] This experience is essential[9] ; the Court concludes that these individuals likely well know the difference between good policing and bad, and, most importantly, have proven track records of teaching and implementing the former.
While prior, enlightened law enforcement experience is a critical component necessary to oversee the specific reforms stipulated by the Decree, the team is not limited to individuals who have served as police chiefs. Indeed, far from it-the team includes former federal civil rights prosecutors, including Deputy Monitor Seth Rosenthal, with experience investigating police corruption and use of force. And the team includes leading academics in behavioral sciences and criminology such as Dr. Randolph Dupont, a nationally recognized leader in developing crisis intervention protocols for dealing with individuals with mental health issues.
Last, but certainly not least, the Court commends the parties and the proposed team for reaching out directly to local organizations to ensure that the community's voice is heard throughout the implementation of the Consent Decree. In particular, the proposed team includes Baltimore Community Mediation Center (BCMC), a local organization led by Ms. Shantay Guy, that is well-established and respected in the Baltimore community. As discussed above, the Consent Decree envisions continuing community participation throughout the life of the Decree to insure that the specific reforms adopted are being felt within the communities most likely to be impacted. Moreover, improving the relationship between members of the Baltimore community and the BPD is a key overarching goal of the Consent Decree. The Court believes that engaging BCMC is a strong first step towards achieving these goals. While there is still much work to be done by the monitor and team in this area, the Court is encouraged by this initial step.
In sum, the Court believes the proposed monitor and team possess the requisite expertise and experience to successfully assist and oversee execution of the reforms mandated by the Consent Decree, and to do so in an efficient, transparent, and accountable manner.
* * *
Accordingly, it is ORDERED that the Parties' JOINT MOTION TO APPOINT INDEPENDENT MONITOR (ECF No. 64) seeking the appointment of Kenneth Thompson as the Independent Monitor of the Consent Decree is GRANTED, and he is now so APPOINTED, serving at the pleasure of the Court (ECF No. 2-2 at 161, 164, as modified by ECF No. 39).

In their joint motion, the parties request that the Court "appoint as Independent Monitor a team composed of members of the Exiger/21st Century Policing, LLC (21st Century Policing) team, members of the Venable LLP (Venable) team, and Community Mediation Program, Inc. (doing business as Baltimore Community Mediation Center, BCMC)." (ECF No. 64 at I (emphasis added).) The Court notes, however, that the Consent Decree contemplates appointment of an individual as the Monitor to serve as an agent of the Court and to be accountable as such. See, e.g., ECF No. 2-2 at 164, as modified by ECF No. 39 ("[T]he Court, on its own initiative and its sole discretion, may replace the Monitor or any member of the Monitor's team. " (emphasis added)). Therefore, the Court construes the request as one to appoint Kenneth Thompson as the Monitor.

At this convenient moment, the Court takes this opportunity to remind all interested parties exactly what this Decree is and what it is not: It is an order entered by the Court to resolve a specific dispute between parties that calls for certain, specific reforms: it is not a panacea for the wide array of social issues that might affect Baltimore and other similarly situated large metropolitan areas.

The proposed monitoring team is made up of experts originally associated with two different candidate teams, Venable LLP and Exiger/21st Century Policing, LLC. Both of these teams were finalists in the selection process, and leaders and experts from both teams participated fully in the public portion of the selection process.

The Court did not recommend which teams should be combined-only the concept.

See Exiger/21st Century Policing, LLC, Application to Serve as Independent Monitor for the City of Baltimore Police Department, at 4 (June 8, 2017), available at https://consentdecree.baltimorecity.gov/sites/default/files/Exiger.pdf.

In addition to Mr. Ramsey, the team also includes three other members of the eleven-person task force.

Interview with Proposed Monitor and Team, at United States District Court for the District of Maryland in Baltimore, MD (Sept. 26, 2017).

Interview with Proposed Monitor and Team, at United States District Court for the District of Maryland in Baltimore. MD (Sept. 26, 2017).

These are but examples of the many innovative police reform initiatives in which these team leaders have been involved.